1

The Honorable Benjamin H. Settle

2

3

4

5

6

7                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
8                                 AT TACOMA

9   CONFEDERATED TRIBES OF THE              NO. C08-5562
    CHEHALIS RESERVATION, a federally
10  recognized Indian tribe on its own behalf and as    PLAINTIFFS' MOTION FOR
    *parens patriae* for its members, and CTGW,    SUMMARY JUDGMENT RE:
11  LLC, a limited liability company organized    *BRACKER* PREEMPTION
    under Delaware law,
12                                          NOTE ON MOTION CALENDAR:
                        Plaintiffs,          JANUARY 22, 2010
13
            v.                              ORAL ARGUMENT REQUESTED
14
    THURSTON COUNTY BOARD OF
15  EQUALIZATION, a political subdivision of the
    state of Washington; Thurston County Board of
16  Equalization members JOHN MORRISON,
    BRUCE REEVES and JOE SIMMONDS, in
17  their official capacities; THURSTON COUNTY
    ASSESSOR PATRICIA COSTELLO, in her
18  official capacity; THURSTON COUNTY, a
    political subdivision of the State of Washington;
19  and THURSTON COUNTY TREASURER
    ROBIN HUNT, in her official capacity,
20
                        Defendants.
21

22                         I.  **RELIEF REQUESTED**

23          Plaintiffs Confederated Tribes of the Chehalis Reservation ("Tribe") and CTGW, LLC,

24  a Delaware LLC doing business exclusively on trust land owned by the Tribe ("CTGW" or

25  "LLC"; collectively "Plaintiffs"), move for summary judgment on their claim that Defendants'

26  personal property taxes ("Taxes") on Great Wolf Lodge (the "Property" or "Lodge") are

27  preempted and thus unlawful under federal law, given an undisputed factual record that:

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:          **Williams, Kastner & Gibbs PLLC**
*BRACKER* PREEMPTION - 1                              601 Union Street, Suite 4100
(C08-5562)                                            Seattle, Washington 98101-2380
2719364.11                                            (206) 628-6600

- The United States and the Tribe comprehensively regulate the Property.
- The Taxes are contrary to the interests of the United States.
- The Taxes are contrary to the interests of the Tribe.
- No significant services are provided by Thurston County or local taxing districts to either the Property or the underlying 39-acre real property ("Trust Property").
- As a matter of state law, the non-payment of the Taxes has no bearing on whether the County or taxing districts can fund or provide any governmental services.

Plaintiffs are entitled to judgment as a matter of law, specifically: (1) a declaratory judgment pursuant to 28 U.S.C. § 2201 that Defendants' Taxes are preempted under *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980), and its progeny; and (2) a permanent injunction prohibiting Defendants from assessing, taxing, seeking to collect, collecting or enforcing the collection of the Taxes on the Property.

## II. __INTRODUCTION__

### A.    __Plaintiffs Are Not Moving On "Per Se" Exemption.__

Plaintiffs seek an order that the Taxes are preempted under *Bracker*.  But it is important to note what the instant motion is not.  This motion does not argue that CTGW is *per se* immune from the Taxes.  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 n.17 (1987) ("In the special area of state taxation of Indian tribes and tribal members, we have adopted a *per se* rule.").  For the purposes of this motion only, Plaintiffs assume that CTGW is non-Indian, which, as the Court and the Parties have agreed, triggers *Bracker*.  Dkt. 100, 6:15-19.  As such, this motion does not hinge on whether CTGW, owned 51% by the Tribe, is Indian or not.  The Tribe's majority ownership, which Defendants admit yet may still characterize as minority ownership, is relevant only as to Tribal interests under *Bracker*, as discussed below.

### B.    __This Is A Case About *Property* Taxes.__

As Defendants admit: the Taxes are levied on buildings and other improvements majority owned (51%) by the Tribe, and permanently affixed to the Trust Property.  Plaintiffs are not challenging any tax on transactions with non-Indians regarding commodities like

1  cigarettes or gaming – topics dealt with in cases Defendants will cite.  Plaintiffs are not

2  challenging any tax on the sales of materials used in the construction of the Lodge.  That is

3  because Plaintiffs are exempt from such state taxes.  What Plaintiffs challenge are the only

4  taxes assessed at the Lodge – state taxes on the Tribe's **Property**.

5       Defendants will attempt to portray Plaintiffs as manipulating state tax laws.  They will

6  attempt to paint the Tribe as "marketing a tax exemption" to non-Indians, as with cigarette or

7  retail sales; yet ignore the significant Tribal taxes levied on CTGW's patrons.  Defendants will

8  attempt to deflect the Court's attention away from the profound federal and Tribal interests in

9  the subject of the Taxes – the Property – by observing that United States Code Title 25 and its

10 companion regulations do not contemplate tribal waterparks.  Defendants will fail to observe

11 that no court has ever applied *Bracker* and upheld a state tax levied on an entity with any true

12 tribal ownership, let alone 51%.  Defendants hope this Court will ignore bedrock legal notions

13 of Indian property and taxation[1] and instead dwell on where the joint venture's formation

14 documents are on file.  Again, though, this is a case about a state tax on Tribal **Property**.

### III.  UNDISPUTED FACTS

**A.    Tribal Backdrop and Related County Admissions.**

17       1.    The Confederated Tribes of the Chehalis Indian Reservation ("Tribe") is a

18 federally-recognized tribal government that governs a reservation at the confluence – and

19 within the floodplain – of the Black and Chehalis Rivers in Southwest Washington together

20 with additional parcels of trust land located in Thurston and Grays Harbor Counties.  Dkt. 61,

21 p. 3.  The Reservation, which constitutes about 4,200 acres of the Tribe's aboriginal

22 homelands, was created by Secretarial Order in 1864 for "the use of the Chehalis Indians."  *Id.*

23       2.    The Tribe has approximately 800 enrolled members, three hundred of whom are

24 under the age of 18.  The Tribe is already planning to help find or provide employment for

25 these minors in the next twenty years.  Declaration of Chairman David Burnett, ¶ 5.

---

[1] *E.g.*, *Worcester v. Georgia*, 6 Pet. 515, 561 (1832), wherein the U.S. Supreme Court announced a clear rule that state government does not have any jurisdiction in Indian Country; and *The Kansas Indians*, 72 U.S. 737 (1867) and *The New York Indians*, 72 U.S. 761 (1867), wherein the Court ruled states have no power to tax Indian lands.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 3
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

3.    The Tribe provides a broad spectrum of essential governmental services and programs to Tribal members, as well as its non-Indian neighbors, including, without limitation: a health and dental clinic, law enforcement, judicial services, social services, drug and alcohol abuse programs, Indian Child Welfare assistance, early childhood education, higher education scholarships, employment and vocational assistance, housing, water and sanitation, environmental and natural resource protection, and road maintenance.  Burnett Decl., ¶ 6.

4.    In 2005, the Tribe and Great Wolf Resorts, Inc. (then, its non-public predecessor Great Lakes Companies), a non-Indian publicly-traded corporation headquartered in Madison, Wisconsin, with substantial waterpark expertise, formed CTGW, LLC under Delaware law.[2] Burnett Decl., Ex. 1 at 1.  The purpose of the Tribe's joint venture with Great Wolf Resorts, Inc. ("GWR") was to develop 39-acres of a 42.99 acre trust land parcel adjacent to Interstate 5, near Exit 88 and off of Highway 12, in Grand Mound, Washington into a destination conference center, hotel and waterpark.  *Id.* at 1-2.

5.    The Trust Property lies within the Tribe's aboriginal territory and constitutes Indian Country under 18 U.S.C. 1151, and as such, is subject to the Tribe's exclusive jurisdiction (vis-à-vis Defendant Thurston County and the State).  *Worcester*, *supra*, fn. 1.

6.    The Tribe owns an undivided 51% of CTGW.  GWR – through its subsidiary, Great Wolf Lodge of Chehalis, LLC – owns an undivided 49%.  Burnett Decl., Ex. 1, at 11, Art. I, § 1.1.[3]

7.    Chehalis Tribal Chairman David Burnett serves as the Chairman of CTGW. Burnett Decl., ¶ 1, Ex. 17; Burnett Decl., Ex. 17.

8.    By 2008, the Members developed the intended conference center, hotel and waterpark on the Trust Property, which the Tribe leased to CTGW.  The facility, which cost approximately $172 million to build, is commonly known as the Great Wolf Lodge

---

[2] As Harvard Professor Joseph P. Kalt, Ph.D., explains: "Tribal LLCs are commonly incorporated under a variety of legal systems, including tribal incorporation codes and various states' incorporation codes (such as the familiar use of Delaware as the state of incorporation)." Declaration of Gabriel S. Galanda, Ex. L, p.13.
[3] The Tribe and GWR, inclusive of Great Wolf Lodge of Chehalis, LLC, shall be referred to as "the Members."

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 4
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  ("Property," "Lodge" or "Improvements").  Burnett Decl., ¶¶ 39, 52.

2      9.    Defendants admit: "Great Wolf owns 49% of the Great Wolf Lodge and the

3  Tribe owns 51%."  Dkt. 13, 2:3-4.

4      10.   Defendants admit "that the Assessor valued the improvements in 2007 as

5  partially completed, and then reduced the taxable value based on the Tribe's 51% ownership

6  interest in CTGW, LLC."  Dkt. 55, p. 7, ¶34.  As such, Defendants contend: "The Tribe's

7  membership interest in CTGW is not being taxed.  By assessing property taxes on Great Wolf's

8  49% ownership interest in the improvements and not on the 51% interest owned by the Tribe,

9  the tax need not fall on the Tribal interests."  Dkt. 13, p. 9.  By assessing the Taxes against

10  CTGW at 100% of the taxable value of the Property in 2008 and 2009 (as discussed below),

11  Defendants admit those Taxes fall on the Tribal interests.

12      11.   Defendant Thurston County Assessor admits that "portions of the improvements

13  appear to be permanent in that they are not capable of being removed without being

14  destroyed."  Galanda Decl. Ex. M, 2:19-24, 10.

15      12.   Defendants further "admit the lease provides that the improvements shall remain

16  on the Trust Property after termination of the lease."  Dkt. 55, p.4, ¶19.[4]

17  **B.    The Tribe Bought And United States Acquired The Land To Further The Tribe's**
18  **Economic Development Goals; The County Supported The Federal Acquisition.**

19      13.   The Tribe purchased the 42.99-acre tract on which the Great Wolf Lodge sits,

20  on August 28, 2002 (prior to its trust status, "the Land").  Galanda Decl., Ex. A at 1.

21      14.   On May 10, 2004, the Tribe petitioned the United States to take the Land into

22  trust for the explicit purpose of economic diversification and tax base expansion through

23  building and owning the Lodge and entering into a joint venture.  *Id.*

24      15.   In 2004, Defendant Thurston County was provided with documentation

25  regarding the United States' proposed trust acquisition of the Land and its bases for doing so.

26  *Id.*  Defendant County supported the United States' acquisition of the Land, writing: "As the

27  ───────────────
[4] Defendants are estopped from arguing contrary to any of their admissions, including those in Paragraphs 9-11.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:          **Williams, Kastner & Gibbs PLLC**
*BRACKER* PREEMPTION - 5                             601 Union Street, Suite 4100
(C08-5562)                                           Seattle, Washington 98101-2380
2719364.11                                           (206) 628-6600

three members of the Thurston County Commission, we wish to express our support for the development plans of the Chehalis Tribe for a hotel and convention center abutting the Urban Growth Area of Grand Mound in southern Thurston County. . . . We also look forward to the prospect of the Tribe's hotel-convention center project hooking up to the county's state-of-the-art sewer system and water system in Grand Mound." *Id.* at p. 5.

16.     As part of having the Land taken into trust, the Bureau of Land Management reviewed the legal description, title commitment, statutory warranty deed, and the record of survey on June 9, 2004. *Id.* at p. 1.

17.     Based on the Tribe's business plan and trust application, the Bureau of Indian Affairs ("BIA") concluded that "the Tribes plan to use the subject property for a hotel and convention center and thus, I [the Regional Director] further find that this acquisition of the land is necessary to facilitate tribal self-determination and economic development." *Id.* at pp. 2-3.

18.     The BIA also found that: "For the Tribes to achieve a reasonable level of self-sufficiency, they must acquire additional land outside the floodplain. In 2002 the Tribes acquired the subject property for the purpose of economic development and the land is also located outside the floodplain. The Tribes plan to construct a 125,000 square foot convention center and a 200-room hotel." *Id.* at p. 3. The BIA explicitly contemplated the Tribe's lease of the Land, once held in trust, to its "joint venture." *Id.* at p. 8.

19.     The BIA further concluded that, "the acquisition of the parcel into trust status would greatly enhance the Tribe's economic development potential, which is the paramount objective of the Tribes. The proposed project will provide much needed economic and/or employment opportunities for tribal members, and thus, allow many to stay in their aboriginal homeland. It will also provide the Tribes with revenue that could be used for the following:

- Strengthen the tribal government.
- Provide new tribal housing.
- Improve the quality of life of the tribal members by enabling the Tribes to fund a variety of social, governmental, administrative, education, health and welfare services.

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

- Provide capital for other economic development and investment opportunities.

Based on the above facts, I find the Tribes have demonstrated a need for the subject property."

*Id.* at p. 3.

20.     Notice of the proposed fee-to-trust conversion and the underlying business proposal was sent to Thurston County and the Governor of Washington on June 1, 2004.  In response, according to the United States, "the proposed project has generated a substantial amount of support from Senator Dan Swecker, Republican Leader Richard DeBoldt, State Representative Gary C. Alexander, Thurston County's Fire Department, Norm Dicks and Brian Baird, Members of Congress of the United States, State of Washington's Governor's Office of Indian Affairs, and Thurston County Chamber of Commerce." *Id.* at pp. 4-5.

21.     For example, U.S. Representatives Norm Dicks and Brian Baird wrote that development of an economic anchor in Grand Mound and South Thurston County would generate hundreds of jobs in a region struggling with high unemployment. They indicated that without a doubt, the project would benefit tribal and non-tribal residents. *Id.* at p. 4.

22.     Fire District #1 Chief Robert W. Scott likewise expressed his support for the fee-to-trust conversion, believing the development of a facility on the Land would be extremely important to the growth and economic well-being of South Thurston County. *Id.*

23.     Similarly, the Thurston County Chamber of Commerce noted that the development of a hotel/convention center would be a "hinge pin" for economic growth in South Thurston County. *Id.* at 5.

24.     Pursuant to federal law, 25 C.F.R. 151.12(e), the County was asked to provide:

A description of the effect on the State and its political subdivisions of removing the land from tax rolls.  Describe any measures the applicant will take to reduce these effects.  The description of effects must include an explanation of: (1) <u>The amount of annual taxes currently assessed by the local government(s);</u> (2) The amount of annual revenue lost from special assessments to the local government(s), if any; (3) The amount of annual revenue lost from mineral receipts to the local government(s), if any; and (4) The local government's ability to provide public safety services for the land" (emphasis added).

25.     In response to the BIA's request, Defendant Thurston County indicated that the

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  only local governmental services provided the Land were police, fire, and water and sewer

2  services, as discussed below.  Neither the County nor its Assessor expressed any concern about

3  the removal of the Land from its tax rolls, or any annual revenues that would be lost to it or

4  local taxing districts.  The County's only stated concerns regarded the preservation of wetlands

5  and oak woodlands.  Galanda Decl., Ex. A at 5; Ex. C.

6        26.     The United States determined: "According to Thurston County the property

7  taxes are $10,537.25; however I do not consider the amount of property taxes to be a loss to the

8  County, if the land is taken into trust, to be so significant as to weigh against the acquisition,

9  especially since there is so much support for the fee-to-trust acquisition.  Most of all the letters

10  of support indicate that the development of a hotel and convention center would have positive

11  impact/influence on the economy, which is much needed due to the national economy and the

12  federal timber policies."  Galanda Decl., Ex. A at 6.

13        27.     Subject only to above-mentioned environmental mitigation issues, Defendant

14  Thurston County's Board of Commissioners stated its support for the Tribe's plans for a hotel

15  and convention center. *Id.*; Galanda Decl., Ex. C.

16        28.     The United States "concluded that the Tribes have a need to acquire this

17  property for self sufficiency and economic purposes . . . I confirm my foregoing conclusions

18  and further conclude that the Tribe's justification of anticipated benefits from the acquisition

19  (i.e. hotel and convention center – and economic development activity) withstands my utmost

20  scrutiny when considering the distance of the subject property from the Tribes' reservation (i.e.

21  approximately 7 miles)."  Galanda Decl., Ex. A at 6.

22        29.     The United States specifically found that the removal of $10,537.25 per year

23  from Defendant Thurston County's tax rolls was a slight impact, and that the State's impact

24  was also assumed to be minimal because it did not express any concern in that regard.  *Id.*

25        30.     The United States further found that the Tribe's existing law enforcement could

26  easily absorb additional workload regarding the Land.  It further observed: "We assume that

27  the County and the State concur in our conclusion because neither raised any jurisdictional

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    issues when their comments were sought about this proposed acquisition." *Id.* at p. 7.

2        31.    The United States further found that "the State of Washington did not raise any

3    concerns about jurisdiction problems and/or potential conflicts concerning land use.

4    However . . . Thurston County indicated the proposed uses (hotel and convention center) are

5    not included in their present zoning designation [Planned Industrial Park].  However, the

6    County did not indicate any opposition of the proposed action.  In fact, the County previously

7    indicated on July 20, 2004, that they have and continued to have a good working relationship

8    with the Tribes on various public works projects in the area." *Id.* at p. 7.

9        32.    The United States found that the "(1) Fee to Trust Acquisition, and (2) hotel and

10   convention center development and operation" would "provide the greatest socioeconomic

11   benefit to the Tribes.  In addition to providing local economic opportunities for the Tribes, it

12   would also provide an economic benefit for the community.  The Grand Mound community

13   and Thurston County recently invested, through the bond process, $12.5 million to upgrade

14   water and wastewater infrastructure serving the project area.  Development of the proposed

15   hotel and convention center would result in the payment to the local utility district and would

16   assist in paying down debt from this infrastructure investment." *Id.* at pp. 8-9.

17       33.    On February 17, 2006, the United States acquired title to the Land, converting

18   the 42.99 acres from fee to trust title, and thereby removing the Land from Defendants'

19   jurisdiction and taxing authority.  Burnett Decl. Ex. 2.

20       34.    Effective July 9, 2007, after an extensive review and approval process by the

21   BIA, the Tribe leased 39 acres of the Trust Property to CTGW, for a 25-year term, with a 25-

22   year option to renew.  Dkt. 3 ("Lease"), Art. 5.

23   **C.**    **The Tribe Created the Joint Venture Contemplated by the Federal Findings to Develop the Trust Property; and Co-borrowed and Guaranteed $102 Million.**

24

25       35.    In 2005, the Tribe formed the joint venture contemplated by the Tribe, United

26   States and Defendants in the Tribe's fee-to-trust application: CTGW, which would build and

own the Lodge/Property.  Burnett Decl., Ex. 1.

27

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

36.     The Tribe's single purpose for purchasing the Land, having it taken into trust by the United States, joint venturing with GWR to develop the Trust Property, and building the Property, was to further the Tribe's goal of economic development, which in turn would increase the Tribe's economic self-sufficiency and as a corollary further reduce the Tribe's dependence upon federal funding. Galanda Decl., Ex. A at 3; Burnett Decl., Ex. 1.

37.     The Tribe recognized the necessity of diversifying its economic base due to, *inter alia*, its inability to tax real property like non-tribal governments; the economically and politically volatile nature of Indian gaming, which has been the principle source of revenue for Tribal programs; and the steady decline in the types and amounts of federal dollars available to tribal governments pursuant to the federal-tribal trust relationship. *Id.*, ¶ 8-10.

38.     By 2005, the Tribe had hospitality experience, as owner and operator of the Lucky Eagle Casino and adjoining Eagle's Landing Hotel, but wanted to diversify beyond its gaming-related revenues. Appreciating its hospitality experience and the absence of any resort/conference facility for State Capitol residents and visitors, developing such a facility on the Land dovetailed with the Tribe's strengths, goals and economic comfort level. *Id.*, ¶ 11.

39.     The Tribe selected GWR as its joint venture partner to develop the future Trust Property for a number of governmental reasons. GWR, now publicly traded, was a premier waterpark/hotel industry proprietor, which could bring the necessary expertise to accomplish the development of the Lodge. The Tribe also realized that GWR would bring a balance sheet and a history of financial performance that allowed the Members to obtain millions of dollars in financing for the Lodge project, which the Tribe could not obtain by itself. *Id.,* ¶ 12.

40.     The Members underwent a substantial commercial negotiation, which involved various potential terms for the proposed joint venture, in various interim documentation. The negotiations led to the signed, binding Limited Liability Agreement of CTGW, LLC ("LLC Agreement"), and related agreements discussed below. Burnett Decl., ¶ 13, Ex. 1.

41.     The Members – specifically Tribal CFO Kris Salmon and GWR financial staff – jointly drafted and issued a request for proposal to banks and financiers, including those with

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 10
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    which the Tribe had preexisting relationships, such as Wells Fargo and Bank of America.

2    Burnett Decl. ¶15, Ex . 3.

3         42.    The Tribe concluded that neither federal loans nor BIA loan guaranties were

4    available to for the Lodge project.  Galanda Decl., ¶16, Ex. D(1) 31:8-32:1.

5         43.    The Members eventually expended $172 million for the Lodge project.  The

6    Members borrowed $102 million from the Marshall Financing Group, of which the Tribe

7    guarantied 51% and GWR 49% ("Marshall Loan").  The Members contributed another $70

8    million to CTGW to finance the project.  Burnett Decl., ¶ 17.

9         44.    The Tribe contributed to CTGW $6.3 million in cash as common capital; $10.95

10   million in state construction excise tax savings (subject to true up), which the Members

11   referred to as "sovereign benefits;" the Trust Land leasehold interest valued at $3.64 million

12   and $8 million in preferred equity (all of which are detailed below).  *Id.*, ¶¶ 18-19.

13        45.    GWR contributed to the LLC $19.2 million in cash as common capital; loaned

14   the LLC $14.9 million in subordinated debt for construction cost modifications; and

15   contributed $8 million in preferred equity.  *Id.*, ¶ 20.

16        46.    The Tribe, as majority owner, insisted that GWR's $14.9 million expenditure

17   become a loan to the LLC, rather than equity, and further that the loan be subordinated to the

18   Tribe's preferred equity and the Marshall Loan.  *Id.*, ¶ 21.

19   **D.    The Tribe Has Contributed *Millions* Of Dollars In Cash, Land Value, Actual And**
         **Budgeted State Excise Tax Savings, And Preferred Equity To The LLC.**

20

21        47.    In bargained for exchange with GWR of a 51% majority equity position in

22   CTGW and its Lodge, the Tribe has contributed to the LLC millions of dollars in: cash, land/

     leasehold value, and actual cost savings, as discussed above.

23

24        48.    With the approval of the United States Department of the Interior's BIA, the

25   Tribe leased the Trust Property to the LLC in July 2007.  Dkt. 3.  The Tribe *and GWR* valued

     the Tribe's 39-acre Lease to CTGW as a $3.64 million contribution to the LLC.  *Id.*, ¶ 19.

26

27        49.    The Tribe was credited with an estimated $10.5 million capital contribution

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 11
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  based on state construction excise tax savings to CTGW, so long as such savings were based

2  on the LLC's actual costs during construction (and not after completion), and reflected in the

3  final construction budget approved by the Members.  Burnett Decl., Ex. 1, 5.1(c), 42-43

4  (defining the "Estimated Exemption Amount" and "Exemption Amount"); ¶¶ 22-26; Ex. 4.

5       50.     During construction, as a result of budget modifications and increases, the

6  Tribe's Estimated Exemption Amount capital contribution increased from $9.5 to $10 million.

7  Burnett Decl., ¶ 23.  In 2008, at the close of construction, the Members estimated the Tribe's

8  contribution would be higher than the $10 million estimate.  *Id.*  As a result, GWR made

9  $456,000 in cash, common capital contributions to CTGW in 2008.  Galanda Decl., Ex. E at 6.

10      51.     The Tribe and GWR met in July 2008 to discuss the calculation of the Tribe's

11  (actual) Exemption Amount capital contribution.  Estimated state construction excise tax

12  savings, and thus the Tribe's Estimated Exemption Amount capital contribution, currently total

13  $10,964,213, subject to the Members' forthcoming "true up" of construction costs as

14  contemplated by the LLC Agreement.  Galanda Decl., Ex. F 35:6-16.

15      52.     Assuming the Tribe's Exemption Amount capital contribution "trues up" to

16  $10,964, detailed in Exhibit 4 to Burnett Decl., which reflects the current budget of the LLC's

17  final actual Lodge construction costs, GWR would be required to make an additional common

18  capital contribution to CTGW of approximately $926,401.  Burnett Decl. ¶ 24.  Until that

19  occurs, the Tribe will have contributed more than 51% of the LLC's equity.  *See* Burnett Decl.,

20  Ex. 1 at 11; *see also* Burnett Decl., Ex. 4.

21      53.     Crucially, the Tribe neither sought nor received any equity credit from GWR in

22  exchange for exemption from the subject Property Taxes, or any state or local taxes other than

23  the state construction excise taxes (to which there is no dispute about preemption).[5]  **Actual**

24  **cost-based state construction excise tax savings were/are the only "sovereign benefit" the**

25  **Members have used for purposes of the Tribe's equity position in CTGW.**  *Id.*, Ex. 1.

26

27  _____

[5] Washington State's Department of Revenue ("DOR") has formally determined that Lodge-related state construction excise taxes are preempted, as are state retails sales taxes arising from the Lodge.  Dkt. 48, Ex. A.

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

54.     The Members also loaned CTGW monies above and beyond their respective common equity contributions.  The Members refer to these loans as preferred equity to be paid back to them by CTGW in priority over common equity cash disbursements from the LLC.  In 2008, the Tribe took over its Member's share of the preferred equity in the Lodge project by reimbursing GWR $8 million of the $16 million preferred equity advanced by GWR and thus becoming entitled to the 11% per annum interest on preferred equity.  In 2008, the Tribe received a $736,000 return on its $8 million cash investment.  Galanda Decl., Ex. G 215:16-22.

55.     In April 2007, CTGW executed a Management Services Agreement and a License Agreement with GWR subsidiary, Great Lakes Services, LLC ("GLS"), under which GLS receives or is entitled to receive various performance-based fees, including those for management, central reservations, licensing, and brand marketing.  Burnett Decl., Exs. 5 at 24, 46; 6 at 8-9; 1 at CT00662.  Because of GWR's equity position in CTGW, the management fee and a related incentive fee are less than the Tribe would expect in a purely hospitality management relationship.  Burnett Decl., ¶ 29.

56.     The Management Services Agreement and License Agreement each have a 50-year term, with a 50-year option to renew.  *Id.*, Exs. 5, 6.  Those agreements and GLS's fee structure therein were a part of GWR's bargained for exchange with the Tribe of its 49% minority equity position and managing member designation for CTGW.  Burnett Decl., ¶30.

57.     After payment of the LLC's expenses, debt service and retentions for reserves and working capital, any profits or losses will be distributed 51% to the Tribe and 49% to GWR.  Burnett Decl., Ex. 1.  Depreciation is also allocated to the Members on a 51-49% basis.[6]  Burnett Decl., Ex. 1 at 11, 45-47, Art. VI, § 6.1-6.5.  In 2008, the Tribe's 51% of the LLC's losses totaled $2,831,804. Id., Ex. 31.[7]

---

[6] The 51% of losses and depreciation actually harm the Tribe disproportionately and thus the Taxes have an even greater negative effect on the Tribe's ability to provide essential services.  The Tribe does not pay income taxes, and therefore cannot take advantage of tax savings as a result of losses or depreciation.

[7] Through accounting sleight of hand, Defendants will use CTGW's audited financial statement for the year 2008 to portray the Tribe as a minority owner of the LLC, with as little as 13% equity.  Galanda Decl., Ex E. Defendants, however, will not likely cite the Court to footnotes to the financial statement prepared by Grant Thorton that explain why, under GAAP (which Section 8.1(a) of the LLC Agreement requires the company's

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 13
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

**E.    The Tribe Co-Managed The Lodge Construction, With Saxas, Its Construction Company, Serving As A Contractor And Providing Security To The Project.**

58.    Because the 42.99 acres had been taken into trust but the 39-acre Lease had not yet been federally approved, and in order to expedite the construction process, the Tribe, alone, began construction of the Lodge in June 2006.  Construction began under the sole direction of the Tribe's project executive, James May.  May Decl., ¶¶ 7-8.

59.    Saxas Construction, LLC, the Tribe's construction company ("Saxas") initially served as the prime contractor.  When the Lease and thus CTGW and GWR's participation in the Lodge project were approved by the United States, construction continued under the co-management of Mr. May and his counterpart for GWR/GLS, Rick Davidson.  *Id.*, ¶¶ 7-9

60.    Both the Tribe and GWR received substantial fees, outlined in the LLC Agreement, for development and construction management of the Lodge project.  Burnett Decl., Ex 1, Art. V, § 5.1(c).

61.    The Members, as co-managers , jointly interviewed and selected Absher Construction as the general contractor.  Saxas became a subcontractor.  Burnett Decl., ¶ 33.

62.    Saxas, as prime and sub-contractor, performed or provided various services, including: earth work; subgrade building pads and utilities; the sewer main along the Highway 12 frontage; dewatering on the 39-acre site; structural work to the Lodge; and construction management of the 30,000-square-foot conference center wing.  Saxas was paid over $5.2 million on its contracts for construction of the Lodge.  Saxas was paid an additional $275,000 to provide security to the project from June 2006 through March 2008.  Burnett Decl., ¶ 33.

63.    Saxas employed nine Tribal members as carpenters and general laborers, and another twelve Tribal members as security shift watchmen, during the Lodge's two years of construction.  *Id.*, ¶ 33.

64.    Under the LLC Agreement, the Tribe was responsible for all inter-governmental dealings relative to the Lodge's development.  Burnett Decl., Ex. 1, Art III, 3.7(a).

---

auditors to follow), the Tribe's non-cash contribution of the value the Trust Property and Lease, and state construction excise tax savings, are not accounted in the Statement of Members' Equity.  *Id.*, Ex. E at p. 5.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 14
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    65.    As the Tribe's project executive, Mr. May negotiated intergovernmental

2    agreements relating to the Property for water, sewer and road services.  Burnett Decl., Exs. 7-9.

3    These agreements included provisions requiring the Tribe, as a neighboring government to

4    Defendant County, to perform in ways that exceeded that normally required of a developer.

5    May Decl. ¶¶ 15-16.  The Tribe undertook certain duties and obligations because it was

6    explicitly understood the County would not be getting tax revenues from the project.  *Id.*, ¶ 22.

7    66.    For instance, the Tribe agreed to connect and pay and in turn, paid for

8    connection to Defendant County's water and sewer plant, which, by all accounts, was operating

9    at significant losses since its inception.  Galanda Decl., Ex. JJ 24:12-25, 28:7-29:8, 50:6-25.

10   The County would have faced continual operating losses of at least $400,000 per year, had the

11   Tribe not agreed to a pay the County $3 million for connection to the County's plant, in

12   addition to monies for the provision of water and sewer to the Lodge.  *Id.*; May Decl. ¶ 11.

13   The Tribe considered alternatives to interfacing with the County's plant, but opted to connect

14   to the County's system in part because it helped the County.  May Decl., ¶ 12.

15   **F.    The Tribe, As Majority Owner Of CTGW, Insisted That The Great Wolf Lodge**
     **Of Grand Mound Have A Distinctly Chehalis Tribal Look And Feel.**

16

17   67.    During construction the Tribe insisted that the Lodge be built in certain unique

18   ways that comport with the Tribe's culture, governance and business interests, but were not

19   standard features of the Great Wolf Lodge brand.  Burnett Decl., ¶ 35.

20   68.    The thirteen Great Wolf Lodges owned and/or operated by GWR throughout the

21   country each have a licensed and branded Northwood theme; simply described by GWR's

22   CEO as "trees, warmth, rustic."  Galanda Decl., Ex. H 10:7-11:3.

23   69.    Under and as required by the LLC Agreement, the Tribe insisted that the design

24   and operation of the Lodge "incorporate Pacific Northwest/Chehalis Tribal and/or Native

25   American themes."  Burnett Decl., Ex. 1, at 27, Art III, 3.7(b).

26   70.    The Tribe, because it does not have a totem pole tradition, insisted the totem

27   poles that are erected at the outer entryway to eleven of the other lodges, not be erected at the

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 15
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  Lodge. Galanda Decl., Exs. H 105:14-106:8; Ex. D 154:12-155:11. Instead, two large wolves

2  adorn the exterior entryway. Likewise, salmon, a wildlife species vital to the Tribe, adorn only

3  the Lodge's waterpark. *Id.*, Ex. I 155:20-156:1. ¶

4         71.    The Tribe further insisted that Yellow Feather, a young Indian female

5  animatronic character who participates in the Lodge's popular Clock Tower Show three times

6  each day, be adorned with Chehalis Tribal regalia. Galanda Decl., Ex. I 61:16-21, 77:8-78:4.

7  The Tribe also caused the foyer to the conference center to be adorned with Chehalis Tribal art,

8  and reached agreement to have a "coffee table" book that details the Tribe's history included in

9  each guest room once that book has been completed. *Id.*, Exs. H 155:20-156:4; I 61:22-62:9.

10  In addition, the Lodge's licensed and branded Cub Club provides children the opportunity to

11  make Chehalis Tribal baskets. *Id.*, Ex I at 61:22-62:6.

12         72.    The Tribe, for regulatory reasons, insisted that a Tribal police substation be built

13  inside the Lodge. Burnett Decl., ¶ 36; Galanda Decl., Ex. H 149:12-150:4.

14         73.    The Tribe, for business reasons, insisted that its Lucky Eagle Casino be

15  advertised both in the Lodge lobby and in each guest room, as well as on the Interstate 5-facing

16  electronic billboard. Galanda Decl., Ex. I 74:17-77:22. The Tribe also insisted that a shuttle

17  bus running between the Lodge and the Tribe's on-reservation casino be made available to

18  Lodge patrons. *Id.* None of the other twelve Great Wolf Lodges include any advertisements or

19  promotions for nearby competing businesses. *Id.*, Exs. H 150:5-151:14; I 74:17-76:24.

20         74.    Construction of the Lodge was completed in March 2008. Burnett Decl., ¶39.

21         75.    Under the Lease, CTGW owns the Property/Improvements during its term. Dkt.

22  3. Defendants "admit the lease provides that the improvements shall remain on the Trust

23  Property after termination of the lease." Dkt. 55, p.4, ¶19. Put differently, 100% – not 51% –

24  of the Lodge reverts to the Tribe upon the Lease's expiration or termination, as CTGW has no

25  right to remove the Property in that event. Burnett Decl., Ex. 1, Art. 11, p. 16.

26         76.    The Lodge itself sits on a structural fill and concrete foundation several feet

27  deep in the ground. One major component of the Lodge is more than 15-feet deep in the Trust

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 16
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Property. The various components of the Lodge – the conference center, waterpark and hotel – comprising more than 400,000 square feet, are constructed as a single structure, with all water, electrical, heating and other operating systems fully interconnected. May Decl., ¶ 25.

**G.** **The Tribe, As Majority Owner Of CTGW, Exerts Control Over The LLC's Operating And Capital Budgets And Other Ways Significant To The Property.**

77.   The Tribe, through its Business Committee (Tribal Council), exerts control over the LLC's operating and capital budgets and related expenditures. Burnett Decl., Ex. 1, Art. IV, § 4.2.

78.   Throughout the development of the LLC and the construction of the Property itself, the Business Committee met, considered, and approved significant actions related to the development of the Property, including all construction budgets. Burnett Decl., Ex. 10.

79.   Late each year, GWR consults with the Tribe regarding the operating and capital budgets for the upcoming year. Galanda Decl., Exs. I 51:11-53:7; H 118:18-119:18. During the initial preparation of the budgets, Lodge management consults with the Tribal Chairman. *Id.* Later in the budget process, GWR executives travel from company headquarters in Madison, Wisconsin, to the Chehalis Reservation, to discuss the two budgets with the Tribe. *Id.* The budget process culminates with Tribal approval (or disapproval) of both budgets. *Id.*; Burnett Decl., Ex. 1, Art. IV, pp. 28-32.

80.   In some instances, the Tribe has specifically considered, and in turn approved or denied, certain capital budget expenditures. For example, during the LLC's first budget cycle in 2007, GWR requested Tribal permission for a capital expenditure to build what is now the largest waterslide at the Lodge, the "Howlin' Tornado." Galanda Decl., Exs. D 111:3-16; G 149:3-13. With the Tribe's specific approval of that capital expenditure, the Howlin' Tornado was built.

81.   In 2008, GWR proposed a mid-year capital expenditure to build a sidewalk on the south end of the Lodge to allow for easier guest access to the facility. The Tribe denied the request, deferring the matter for capital budget consideration in 2009. *Id.* Ex. H 51:17-52:4.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 17
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

82.     In 2008, the Tribe also decided how it would develop the other four acres of the Trust Property immediately to the north of the Lodge, which is not subject to the Lease. Burnett Decl., ¶ 40.  To the chagrin of GWR, the Tribe built End of the Trail III, a convenience store and gas station where the Tribe collects a 3% retail sales tax, as well as cigarette and gas taxes at state-negotiated rates.  Galanda Decl., Ex. H 72:17-73:3; Burnett Decl., ¶ 40.  GWR would have preferred the acreage to be used for additional Lodge parking or a "demand generator" business that would increase visits to the Lodge.  *Id.*, Ex. H 72:17-73:3.

**H.     The Tribe Comprehensively Regulates The Property Defendants Seek To Tax.**

83.     The Tribe, through its Business Committee, has authority over, and controls access to its Trust lands, including the Trust Property to which the Property is permanently affixed.  Dkt. 3.  The Tribe regulates all facets of the Property, vis-à-vis Defendant Thurston County, through numerous laws, ordinances, and Tribal governmental departments:

84.     The Tribe regulates the use of the Property and the Trust Property through its Comprehensive Land Use Ordinance.  Burnett Decl., ¶ 41, Ex. 11.

85.     Defendants admit that only the Tribe's land use laws apply to the Property and the Trust Property. Galanda Decl., Ex. JJ 78:6-22.

86.     The Tribe regulates the Property by zoning and planning on the Trust Property under its Zoning Ordinance and Grand Mound Development Plan.  Burnett Decl., ¶ 41.

87.     The Property was constructed pursuant to the Tribal Building Code and Construction Safety Ordinance.  As part of the construction of the Lodge, the Tribe issued electrical, building and utility permits to every contractor or sub-contractor involved in the project, including Absher; Saxas; Lassen Electric Services, Inc.; Neuman Pools; Jones Signs Nationwide; Tech Systems Contracting, LLC; Western Design Group; Ron Travers Electric, Inc.; Cosco Fire Protection; Doyle Construction Company, Inc.; Sterling Breen Crushing, Inc.; Ault Electric; Western States Fire Protection Co.; W.A. Bottling Company; Blue Mountain Mechanical, Inc.; the Tribe itself; Mr. May; and the Lodge. *Id.*, ¶ 42, Ex. 11.

88.     During construction, the Tribe issued a Notice of Violation to Absher for

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 18
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   Absher's failure to follow the general conditions of its Tribal permits.  *Id.*, ¶ 43; Ex. 12.  The

2   Tribe cited three specific violations and threatened Absher with a $5,000 fine per violation.  *Id.*

3   Absher cured the violations without dispute or further violations.  *Id.*

4        89.     The Tribe regulates the use of the Property and Trust Property through its

5   Surface Water Quality Standards and Groundwater Protection Ordinance.  *Id.*, ¶ 44.

6        90.     The Tribe regulates the use of the Property, and CTGW's ownership and

7   operation of the Lodge, by taxing (a) sales transactions and (b) room rentals at the Tribal tax

8   rate of 3%.  Burnett Decl., Ex. 1; Galanda Decl., Ex. D 64:1-65:14.  Lodge Patrons pay a 10%

9   fee; 3% of which is a tax remitted to the Tribe by law; 7% of which is a hospitality fee that is

10  an additional revenue producer retained by CTGW.  *Id.*  CTGW remits the sales and room

11  taxes monthly to the Tribe.  Burnett Decl., ¶ 45; Ex. 13; Ex. 10 at CT4146.

12       91.     No Tribal property taxes are assessed on the Trust Property or Property.  The

13  Tribe does not assess taxes on real or personal property as a matter of Tribal law.  *Id.*, ¶ 47.

14       92.     While the Tribe cannot criminally arrest non-Indians, the Tribal Police still

15  serve as first responders to every law enforcement call to the Lodge, and detain suspects before

16  non-Tribal police might arrest them.  Galanda Decl., Exs. I 50:1-21; D 145:4-20.[8]

17       93.     Again, the Tribe provided water and sewer infrastructure to the Property by

18  paying to connect and in turn connecting to Defendant County's water and sewer plant, under

19  an interlocal fee-for-service arrangement.  Burnett Decl., Exs. 7-9.

20       94.     The Tribe regulates the use of the Property by recording CTGW leasehold and

21  financing-related instruments with the Tribal Secretary, pursuant to Tribal law.  *Id.*, ¶ 48.

22       95.     The Tribe regulates the use of the Property by providing a forum for the

23  adjudication of certain crimes arising at the Lodge.  The Chehalis Tribal Court has prosecuted

24  at least one crime occurring there. Galanda Decl., Ex. I(2) 16:21-17:13.

25

26  _____

[8] As the Sheriff acknowledged in deposition, under a new state law the Tribe can soon obtain authority to detain
27  *and arrest* non-Indian offenders at the Lodge, which will further reduce the already insignificant impact on the
Sheriff's Office.  Galanda Decl., Ex. J 16:7-18, 21:18-23:9.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:          **Williams, Kastner & Gibbs PLLC**
*BRACKER* PREEMPTION - 19                            601 Union Street, Suite 4100
(C08-5562)                                           Seattle, Washington 98101-2380
2719364.11                                           (206) 628-6600

**I.    The United States, With Interests In The Property Of Its Own, Exercises Pervasive Control Over The Property Defendants Seek To Tax.**

96.    When lands are taken into trust, such as the 42.99 acres, all power to tax the property is lost under the terms of the authorizing statute, 25 U.S.C. § 465, which provides that "lands or rights" acquired in trust "shall be exempt from State and local taxation."

97.    Under federal regulation, no state or local laws "governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States," including the leased 39-acre Trust Property and the Lodge.  25 C.F.R. § 1.4.

98.    Federal laws comprehensively regulate any encumbrance of tribal trust lands, such as the Trust Property leased to CTGW.  *See e.g.*, 25 U.S.C. §§ 81 (Secretarial approval of encumbrances of trust lands), § 415 (leases such as the Lease), § 465 (trust land acquisition, discussed *supra*); 25 C.F.R. §§ 81 (encumbrances of trust land).

99.    There is a strong federal policy found in statute against encumbrance or alienation of tribal trust real property and personal property, including the Trust Property and the Lodge/Property.  25 U.S.C. § 85.

100.    In addition to its pervasive federal regulation of the Property, the United States has a profound interest in the Lodge's use.  As outlined above, through the fee-to-trust process, and the review of the planned development of the 42.99 acres, the United States concluded as a matter of law that using the Trust Property for a hotel and convention joint venture facilitated "tribal self-determination and economic development."  Galanda Decl., Ex. A at 2-3.

101.    The United States has an interest, secondary to the Tribe and exclusive of Defendant County, in regulating the health and safety of those who frequent the Property.  The federal Indian Health Service ("IHS") annually conducts a health and safety inspection of the Lodge's restaurant, which the Lodge passed in both 2008 and 2009.  Burnett Decl., Exs. 14, 15.

102.    Thurston County recognizes the Federal health and safety interests having once

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 20
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    referred an alleged Lodge incident of food-borne illness to IHS.  Galanda Decl., Ex. K 35:11-

2    25, 47:19-49:7.

3        103.    The United States has a clear and abiding interest in the economic, social and

4    political status and development of the Tribe flowing from the fact that it is a duly and formally

5    recognized, self-governing American Indian Tribe.  Galanda Decl., Ex. L at 3, § I(D)(1).

6        104.    Federal policy with respect to tribal governments affirmatively seeks and

7    supports self-government and economic self-sufficiency for tribes, and government-to-

8    government relationships between the United States and federally-recognized tribes.  *Id.* at p.

9    4, § I(D)(1)(a).

10       105.    Federal policy recognizes that the long history of impoverishment and

11   disempowerment of tribes and the status of trust lands as inalienable, has made it difficult for

12   tribal governments like Chehalis to develop tax bases; and that accordingly, tribally owned

13   enterprises like CTGW are a ubiquitous form of tax-base creation by tribes in order to provide

14   essential governmental services and programs.  *Id.* at p. 6 § I(D)(4)(b).

15       106.    The Lodge project and the Tribe's maximization of its contributions to the LLC

16   and in turn the Tribe's ability to govern and meet the needs of its citizens are wholly consistent

17   with contemporary federal interests, as expressed in extant federal policy toward Indian tribes.

18   That policy, developed, legislated and implemented over the last forty years, is appropriately

19   summarized as a policy of self-determination for federally recognized American Indian tribes,

20   through economic self-sufficiency and effective self-government.  *Id.* at p. 14 § III(A)(1).

21       107.    The federal policy of tribal self-determination is predicated upon: First,

22   providing greater control to tribal citizens and their governments in planning, designing,

23   implementing and controlling the public affairs of their respective tribes; and, second, the trust

24   relationship between the United States and American Indian tribes.  It is through the trust

25   relationship, including the regulation of tribal trust lands, that the Federal Government retains a

26   significant and ongoing interest in tribal economic self-sufficiency, including economic

27   development such as the Tribe's Lodge project.  *Id.* at p. 14 § III(A)(2).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 21
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

108.    By extension, the United States policy of self-determination entails explicit federal promotion of government-to-government relations between tribes and other domestic governments.  It also entails minimization of the historically pervasive presence of the Federal Government in the institutions of tribal governance; the provision of public services to Native Americans; and the selection, design and implementation of economic and community development plans and projects.  At the same time, however, the Federal Government's role as protector of those assets that are held in trust on behalf of tribes is retained.  As such, the United States continues to have responsibility for tribal economic development via regulation, including protection of the inalienability of tribal trust properties.  *Id.* at p. 15 § III(A)(2)(a).

109.    The United States' policy of Indian self-determination is carried out by the Tribe under federal/Tribal contracts pursuant to Public Law 93-638 – the Indian Self-Determination and Education Assistance Act of 1975 – whereby the Tribe has assumed responsibility for public services historically provided by the Federal Government.  The Tribe in turn provides those services to all of its trust lands, including the Trust Property.  For example, the Tribe has assumed responsibility for police protection by way of such "638" contracts and in turn provides primary law enforcement at the Lodge.  Burnett Decl., ¶ 7.

110.    Current federal policy recognizes that as trustee on the behalf of Indian tribes like Chehalis, the United States has an explicit, fundamental interest in furthering those policies that best promote their social and economic health and well-being.  *Id.* at p. 15 § III(A)(3).

**J.    The Tribe Has Profound Interests In The Property – The Subject Of The Taxes.**

111.    The Tribe has an interest in economic self-sufficiency; the Tribe desires to steadily decrease its reliance upon federal funding to provide essential Tribal governmental services and programs.  Burnett Decl., ¶ 50.

112.    The Tribe has an interest in the Property as an owner of CTGW, which uses the Lodge to generate revenue.  *Id.*, ¶ 51.  Even though the Lodge is still in a start-up mode and both Members were allocated losses in 2008, the Tribe's reliance in GWR's expertise has

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   proven justified; the Tribe expects that there will be net profits allocated in 2009. *Id.*

2     113. The Tribe has an interest in creating value within its lands. *Id.*, ¶ 52. Under

3   Tribal law, Tribal property is not taxable; and the Property is Tribal property. *Id.*, ¶ 53. The

4   Property constitutes other economic value generated from Tribal lands; the Property at issue

5   cost the Tribe and GWR over $172 million in total debt and equity to construct. *Id.*, ¶ 52.

6     114. The Tribe has a profound interest in maintaining the Property free from taxation

7   or encumbrance, and in disallowing any encroachment upon its Trust Property. *Id.*, ¶ ¶ 51-56.

8   As a 51% interest holder in the LLC, the Tribe would bear 51% of the Taxes. Burnett Decl.,

9   Ex. 1, Art. I (1.1) ("proportionate shares" defined).

10     115. Upon the termination or expiration of the Lease, the Tribe's ownership interests

11   in the Property rise to 100%. Dkt. 3. As both a Tribal government and 51% interest holder in

12   CTGW, the Tribe has an interest in ensuring that the Property is not encumbered by taxes, or

13   the County's only alleged recourse – distraint.[9]

14     116. The Tribe has an interest in Tribal economic development that fosters business

15   activity, which the Tribe can tax, as with the 3% sales and room taxes imposed upon Lodge

16   patrons. Burnett Decl., ¶ 54. The Tribe has collected $2,083,860.32 in sales and room taxes

17   through November 30, 2009, which stems directly from CTGW's use of the Property. *Id.*

18     117. The Tribe has an interest in creating Tribal business activity within its territory.

19   *Id.* The revenue that the Tribe enjoys from taxes, and will enjoy from 51% of the LLC's net

20   profits, supports or will support the essential Tribal governmental services provided to CTGW,

21   Tribal members and the Reservation, Grand Mound and South Thurston County communities.

22   *Id.*, ¶56. In addition, the Lodge has created business opportunities for Saxas, the Lucky Eagle

23   Casino and End of the Trail III, as discussed above. *Id.*, ¶ 56.

24

---

25   [9] Even if the Treasurer could legally execute on the Property (she cannot), sale of the Property to a party not
selected by the Tribe would violate the clear federal rule against unapproved encumbrances of tribal trust land.
Indeed, during the preliminary injunction hearing on October 16, 2008, the Court questioned Defendants
26   regarding how they intended to enforce any ruling affirming the Taxes. *Cf. Washington v. Confederated Tribes of
Colville Reservation*, 447 U. S. 134, 156 (1980) (Court did not adopt the State's argument that it could "enter onto
the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell these stocks in
27   order to obtain payment of the taxes due."). Defendants did not know.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 23
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

118.    The Tribe has an interest in creating employment opportunities for Tribal members and their families.  CTGW and the Lodge, like all other Tribally-owned enterprises, operate pursuant to Tribal preference employment policies.  *Id.*, ¶ 57.  Although it was once reported that eight Tribal members worked at the Lodge, approximately 25 Tribal members have been employed there since March 2008.  Galanda Decl., Ex. I 22:16-23:7, 68:9-69:12.

119.    Tribal members have held management positions at the Lodge, and two internship positions have been created at the direction of the Members to increase the number of Tribal members in management at the Grand Mound facility.  *Id.*, Exs. I 24:5-25.

120.    As evinced by the Grand Mound Development Plan funded by the Tribe and promoted by Defendant Thurston County, the Tribe also has an interest in fostering economic development in the non-Tribal territories that surround the Property.  *Id.*, Ex. N; Burnett Decl., ¶¶ 55, 58.  Non-tribal property within one-square mile of the Lodge, which *is* subject to County real and personal property taxation, has recently increased by 14% in assessment value.  Galanda Decl., Ex. L at 45(V)(D)(1)(a).

121.    The Tribe has an interest in its territorial authority and autonomy.  The Tribe has plenary authority vis-à-vis Defendant Thurston County and the State regarding who enters the Trust Property, for what purpose, and when.  The Taxes may only be collected voluntarily or by invasion of Tribal territory.  *See* RCW 84.56.070.

122.    The Tribe has an interest in developing and maintaining regulatory and civil framework to attract development to Tribal lands.  The Tribe regulates virtually every facet of the Lodge, by and through, i.e., room and sales taxation; zoning and building code permitting and inspections; primary law enforcement; Tribal employee preference; and health and safety governance.  Burnett Decl., ¶ 58.

123.    The Tribe contracts on a fee-for-service basis for fire and emergency services, as well as for sewer and water services, having funded, designed, managed and constructed (through Saxas) utility lines to the Trust Property.  Burnett Decl., Ex. 7-9, 15.  The Tribe pays Defendant Thurston County over $50,000 per year, which is allocated to the County Sheriff's

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 24
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    Office, which provides secondary law enforcement to the Lodge.  Galanda Decl., Exs. D

2    181:2-8; J 34:1-16.  The Tribe also contracts and pays for private workers compensation in lieu

3    of State of Washington industrial insurance.  Burnett Decl., ¶ 59.

4         124.    The Tribe has offered to negotiate and pay Defendant Thurston County a fee for

5    any demonstrable impact to the County or its taxing districts caused by CTGW or the Lodge.

6    *Id.*, Ex. 16.  The County has failed to respond to the Tribe's offers.  *Id.* ¶ 59.

7    **K.    The State Has A Comparatively Insignificant Interest Pertaining To The Taxes.**

8         125.    As of 2004, Defendant Thurston County Assessor assessed taxes against the

9    42.99 acres of then fee lands, which are now held in trust by the United States.  Galanda Decl.,

10   Ex. A at 6.  The assessment totaled only $10,537.25.  *Id.*

11        126.    In 2007, amidst Lodge construction, Defendant Thurston County Assessor

12   admits that she assigned a partially complete assessment value to the Property, and then

13   reduced its taxable value by the Tribe's 51% ownership interest in CTGW to a taxable value of

14   $10,115,462; before assessing CTGW a tax on the Property equivalent to GWR's 49% interest

15   in the LLC, for tax year 2008.  Dkt. 55, p. 7, ¶34.  The 2007 assessment totaled $94,294.80

16   based on a partially complete value of $20,643,800.  Galanda Decl., Ex. O.

17        127.    In 2008, the County Assessor assessed the Property at full completion, and at

18   100%, meaning with total disregard for the Tribe's 51% ownership interest in CTGW, for tax

19   year 2009.  Dkt. 55, p. 7, ¶ 35.  The 2008 taxable assessment totaled $82,066,200.  According

20   to the Assessor, had the Property been placed on the County's tax rolls, the 2008 Taxes payable

21   in 2009 would have been $864,466.  Galanda Decl., Ex. P, P(2).

22        128.    In 2009, the County Assessor again assessed the Property at full completion,

23   and at 100%, for tax year 2010.  Galanda Decl., Ex. Q.  The initial 2009 property value totaled

24   $85,954,700.00.  *Id.*.  In November 2009, the Assessor also issued a Personal Property Value

25   Change Notice, which included a "New Value" totaling $8,039.600.  *Id.*, Ex. R.  These 2007

26   through 2009 tax assessments are collectively "the Tax(es)" referred to throughout this Motion.

27        129.    Defendants contend that the State or County interests are affected by the

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 25
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

payment or nonpayment of the Taxes as follows: "The interests of the following taxing districts are supported by proceeds from personal property taxes: Washington State Schools, Thurston County, Thurston County Roads, Medic One, Port of Olympia, Timberland Library, Rochester School District, Fire District #1, Cemetery District #1, and PUD #1." Galanda Decl., Ex. S, Interrogatory 13 at p. 17. **Besides raising revenue for the above local interests, Defendants have not identified any other interests impacted by the non-collection of the Taxes.**

130.    Defendants allege in signed and sworn discovery responses that Cemetery District #1 and Port of Olympia, as well as the County's Coroner, Roads Department, Juvenile Service, Superior Court, Clerk's Office, Office of Assigned Counsel and Mapping Services provide services to CTGW. **However, Fed.R.Civ.Proc. 30(b)(6) designees for each of those taxing interests subsequently testified that their offices provide no services to CTGW or the Lodge, and the Coroner testified that he had provided no services to the Lodge.[10]**

131.    When the United States consulted with the County *and its Assessor* regarding the proposed federal acquisition of the Land, Defendants identified the "governmental services which are currently provided to the property" as follows: "Thurston County currently serves the site with police services provided by the Thurston County Sheriff's Department, Thurston County Fire District, sanitary sewer, and water." *Id.*, Ex. C. The County and its Assessor specifically failed to include the local governmental services they now contend are provided to the 39 acres, e.g., "Thurston County Roads, Medic One, Port of Olympia, Timberland Library, Rochester School District Cemetery District #1, and PUD #1." *Compare* Ex. C, *with* Ex. S.

132.    Defendant Thurston County's Sheriff provides secondary law enforcement to the Lodge and Trust Property, particularly with regard to the arrest of any non-Indian perpetrators there.[11] *Id.*, Exs. D 145:4-20; I 50:5-18. Chehalis Tribal police are the first responder to any crimes and can detain all perpetrators and arrest Indian perpetrators there. *Id.*

133.    According to the County Undersheriff, the Lodge has caused no impact on the

---

[10] *Id.*, Exs. T 17:10-18:15; U 31:19-32:4; V 19:1-20; W 12:22-13:8, 38:25-39:16; X 29:7-30:9; Y 20:11-22:11, 31:12-32:13; Z 33:7-14; AA 46:10-14; BB 39:8-40:4.

[11] *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978) (tribes lack criminal jurisdiction over non-Indians).

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  Sheriff's ability to provide law enforcement within surrounding Grand Mound or South

2  Thurston County. *Id.*, Ex. J 18:17-20:6. According to the Sheriff, any impact caused by the

3  Lodge on his office is insignificant. *Id.*, Ex. CC 12:25-13:24. Again, the Tribe annually pays

4  the County over $50,000 that is allocated to the Sheriff, and has further offered to negotiate and

5  pay for any demonstrable impact to the County caused by CTGW or the Lodge.

6      134.    The Tribe currently contracts with Fire District #1 for fire protection and

7  emergency medical services. Under the agreement, the Tribe pays the Fire District $160,000

8  each year. *Id.*, Ex. DD 13:16-14:1. When the Tribe originally contracted with the Fire District

9  for "Emergency Services," the District provided Advanced Life Support ("ALS") services. *Id.*,

10  Ex. EE 28:9-25.

11      135.    Medic One answered only eleven ALS (life threatening) calls at the Lodge

12  through late 2009; several of which were downgraded to Basic Life Support ("BLS" or non-

13  life threatening) calls contemplated under the current Tribe/Fire District #1 agreement. *Id.*

14      136.    Medic One testified that the average (not incremental) cost of each of the eleven

15  calls was $944. *Id.* The Tribe has offered to negotiate and enter into a fee-for-service

16  arrangement with Medic One, vis-à-vis the County, to offset any demonstrable impact caused

17  by the Lodge. Burnett Decl., Ex. 16.

18      137.    Defendant County's CAPCOM fields 911 emergency calls from the Lodge,

19  referring law enforcement calls to the Chehalis Tribal Police, and injury-related calls to Fire

20  District #1. Galanda Decl., Exs. D 145:4-20; I(2) 9:5-23; DD 42:13-23. Insofar as a crime at

21  the Lodge involves a non-Indian, the Tribal Police will in turn call the Sheriff's Office. *Id.* As

22  to any emergency at the Lodge that is not life-threatening, the District #1 will handle the

23  response; as to any life-threatening emergency there, Fire District #1 will in turn call Medic

24  One. *Id.* As discussed above, the Tribe pays over $210,000 each year for the Sheriff and Fire

25  District's services. *Id.*, Exs. DD 21:21-22:1, 18:6-19:8; I(2) 10:19-11:5.

26      138.    The Tribe has offered to negotiate and pay Defendant Thurston County a fee for

27  any demonstrable impact caused by CTGW or the Lodge to the County, which would include

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 27
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    CAPCOM.  Burnett Decl., Ex. 16.

2        139.    Viewing other County and taxing district services in a light most favorable to

3    local government, they are de minimis:

4        140.    Defendant County's Public Health Department once worked with a Lodge guest

5    who complained of a food-borne illness, referring the matter to IHS; the illness could not be

6    traced to the Lodge.  Galanda Decl., Ex. K 35:11-25, 47:19-49:2.

7        141.    Defendant County's Recorder's Office has recorded a CTGW deed of trust, at

8    the request of the lender of the Marshall Loan; the document was also recorded by the Tribal

9    Secretary's Office under the Tribe's recordation law.  *Id.*, Ex. FF 48:5-25.

10       142.    Defendant County's District Court has handled four garnishment actions against

11   Lodge employees in which CTGW was a passive third-party garnishee defendant.  *Id.*, Ex. GG

12   17:6-18:5.

13       143.    Defendant County's Superior Court forumed the prosecution of a theft at the

14   Lodge.  *Id.*, Ex. Y at 22.  The Tribe has also forumed at least one other crime arising there.

15       144.    Defendant County's Roads Department (now Public Works) plowed Highway

16   99, which adjoins the Trust Property, during last year's snow storm, but has never provided any

17   direct services to the Lodge.  *Id.*, Ex. W.

18       145.    Rochester School District alleges it has provided overflow parking for CTGW

19   on one weekend.  *Id.*, Ex. HH 17:6-23.

20       146.    Both the Tribe and CTGW have made various charitable contributions to the

21   Rochester School District.  Galanda Decl., Exs. D(1) 132:20-133:24; I 73:24-74:8.  In addition,

22   the United States makes "equalization" payments to the School District, recognizing that

23   Chehalis Tribal students "who come from reservations will most likely live on trust property,

24   [which] would not be assessed . . . property tax."  Galanda Decl., Ex. D(1) 133:25-134:11.

25       147.    The sum total of demonstrable impact caused by the Lodge to local government,

26   for which Defendants will argue they are not paid, yet for which the Tribe has offered the

27   County a fee-for-service arrangement:

**Comment [PC1]:** THIS IS REDUNDANT AND MAYBE BETTER LEFT TO ARGUMENT

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

- Eleven Medic One calls, some of which were downgraded to BLS;
- CAPCOM's mere referral of emergency calls to the Tribal Police or Fire District #1, which the Tribe in turn either handles or pays the District to handle;
- One food-borne illness complaint that was referred to the United States;
- A recorded deed of trust filed by the LLC's financiers;
- Four garnishment actions in which CTGW was a passive third party;
- The prosecution of a single incident of theft at the Lodge;
- The Lodge's one-time use of a School District lot for overflow parking; and
- Road plowing, beyond the Trust Property, during one snow event.

148. Plaintiffs' dispute and non-payment of the Taxes assessed against CTGW in 2008 and 2009, has no bearing on whether Defendant Thurston County or any local taxing districts can fund or provide any governmental services within the County.

149. The County Assessor's assessments against the Property in 2008 and 2009 have been removed from the County's tax rolls, as required by state law, specifically RCW 84.52.018. Galanda Decl., Ex. II 8:19-9:1.

150. For 2009, no representative of the County or any of the local taxing districts testified in deposition that local government was unable to fund or provide the same level of services as in prior years as a result of Plaintiffs' non-payment of the Taxes.

151. Indeed, the measured positive impact of the Lodge on the Thurston County economy, through the direct effect and associated earnings of those employed there, and the Lodge's production of output and the direct and indirect impacts thereof, is *substantial*. The Lodge generates regional economic contributions of an additional $50 to $60 million in output; $14 to $18 million in household employment earnings; 500 to 900 jobs; and $30 to $36 million in value-added Countywide, across all business sectors. *Id.*, Ex. L at 47(V)(D)(2)(d), Fig. 13.

152. The Property has also caused spillover benefits from the Lodge demonstrated by the change in the taxable value of non-exempt tax parcels located within a one mile radius of Great Wolf as compared to the change in taxable value of all other tax parcels within Thurston County. As shown by Professor Kalt, the taxable value of such tax parcels lying within close proximity of the Lodge increased by 14% percent over the 2007-2008 time period. Meanwhile, the taxable value of other tax parcels lying within the County increased by only 4% over the same time period. *Id.*, Ex. L at 45(V)(D)(1)(a).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 29
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

153.    Conversely, if, over the 50-year life of the Lease, the Taxes are assessed and collected against CTGW, to which the Tribe would bear a 51% burden, the Tribe would be unable to provide the same level of governmental services to its members.  Galanda Decl., Ex. L 183:19-184:13; 203:15-206:19.

## IV.  ISSUES

Whether, as a matter of law, the Court should grant Plaintiffs' requested relief because there are no material fact issues regarding the federal, Tribal, and state interests affected by Defendants' Tax, and because the federal and Tribal interests outweigh the State's interests.

## V.  EVIDENCE RELIED UPON

Plaintiffs rely on those portions of the Court's record cited herein and the Declarations of Chairman David Burnett, James May, and Gabriel S. Galanda.

## VI.  ANALYSIS

### A.    The *Bracker* "Balancing Test" Applies In This Case.

The law of the case, as enunciated by this Court in July, is that under *Bracker*, the state acts first by asserting regulatory authority and then the Court is called upon to determine whether there is an applicable barrier to that authority.  Dkt. 61, 9:1-3.

The U.S. Supreme Court has laid down bright-line rules for when *Bracker* balancing is appropriate in taxation cases. The rules depend on the "who" and "where": who is taxed and where that person is taxed. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 100 (2005).  First, a court must determine on whom the legal incidence of the tax falls. *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995).  The legal incidence does not necessarily fall on the entity bearing the economic burden of the tax. *Id.* at 459-60.  Instead, it is determined by who has the legal obligation to pay under "a fair interpretation of the taxing statute as written and applied." *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 11 (1985) (per curiam).  Second, a court must determine where the "taxable event" occurs. *Wagnon*, 546 U.S. at 107.  If the legal incidence of the tax falls on an Indian person or entity and the taxable event occurs in Indian Country, then there is a categorical bar: the tax is

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 30
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   invalid unless Congress has expressly given the State authority to tax.  *Chickasaw*, 515 U.S. at

2   459.  If the legal incidence falls on a non-Indian person/entity and the taxable event occurs in

3   Indian Country (the fact pattern for this Motion), then *Bracker* balancing applies.  *Wagnon*,

4   546 U.S. at 112.  Finally, if the taxable event occurs outside of Indian Country, there is no

5   balancing and traditional rules of federal preemption apply.  *Id.*

6        For thirty years, *Bracker* and its progeny have established a specific preemption test for

7   on-reservation or -trust land[12] activities.  As the *Bracke*r Court explained: "In a number of

8   cases we have held that state authority over non-Indians acting on tribal reservations is pre-

9   empted even though Congress has offered no explicit statement on the subject."  448 U.S. at

10  151.  "The Court has repeatedly emphasized that there is a significant geographic component to

11  tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry [and]

12  consistently guarded the authority of Indian governments over their reservations." *Id.*

13       Then in *Ramah Navajo School Board Inc. v. Bureau of Revenue*, the Court expanded

14  the elements to be examined to find or not find federal and tribal preemption in this context:

15           The State's interest in exercising its regulatory authority over the activity in
             question must be examined and given appropriate weight.  Pre-emption analysis
16           in this area is not controlled by mechanical or absolute conceptions of state or
             tribal sovereignty: it requires a particularized examination of the relevant state,
17           federal, and tribal interests . . .  The question of whether federal law, which
             reflects the related federal and tribal interests, pre-empts the State's exercise of
18           its regulatory authority is not controlled by standards of pre-emption developed
             in other areas.  Instead, the **traditional notions of tribal sovereignty and the**
19           **recognition and encouragement of this sovereignty in congressional Acts**
             **promoting tribal independence and economic development inform the pre-**
20           **emption analysis that governs this inquiry**.

21  458 U.S. 832, 838 (1982) (citations/quotations omitted; emphasis added).  Even where "a State

22  imposes the legal incidence of its tax on a non-Indian seller, the tax may nonetheless be pre-

23  empted if the transaction giving rise to tax liability occurs on the reservation and the imposition

24  of the tax fails to satisfy the *Bracker* interest-balancing test." *Wagnon,* 546 U.S. at 102.

25       Because Plaintiffs assume for purposes of this Motion only that CTGW is a non-Indian

26

27  ――――――――――――――――
    [12] Trust land on and off reservation is treated the same in this context.  *Okla. Tax Comm'n v. Potawatomi Tribe*,
    498 U.S. 505, 511 (1991).  References to "on reservation" shall contemplate the Trust Property and Property.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:          **Williams, Kastner & Gibbs PLLC**
*BRACKER* PREEMPTION - 31                            601 Union Street, Suite 4100
(C08-5562)                                           Seattle, Washington 98101-2380
2719364.11                                           (206) 628-6600

1  entity, although 51% owned by the Tribe as Defendants admit, and because the subject of the

2  tax – the Property – is affixed the Tribe's trust land, Defendants' Taxes must satisfy the

3  *Bracker* interest-balancing test.

> **Comment [PC2]:** With this discussion, why isn't the Judge invited to say there is a difference between Reservation and Indian Country. We need to tie the two together here so the question isn't raised.

4  **B.    The Bracker Test Weighs Federal And Tribal Interests Against State Interests.**

5          *Bracker* weighs a state's interest in taxation against federal and tribal interests based

6  on: the respective interests of the Tribe and state, the provision of tribal or state services to the

7  party the State seeks to tax, and the degree of federal regulation involved.  *Salt River Pima-*

8  *Maricopa Indian Community v. Arizona*, 50 F.3d 734, 736 (9th Cir. 1995), *cert. denied*, 516

9  U.S. 868 (1995) ("*Salt River*").  A state cannot tax a non-Indian in Indian Country - state tax

10  jurisdiction is federally preempted - where taxes interfere with or are incompatible with federal

11  and tribal interests, unless the state interests at stake sufficiently justify the assertion of state

12  authority.  *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983).

13         The Court should initially note the following:

14         •      First, no published or unpublished case upholds a tax under *Bracker* where the

15  taxed entity has any level of **true tribal ownership**.

16         •      Second, no published or unpublished case upholds a tax on **property** with any

17  level of true tribal ownership, let alone 100% tribal ownership after a lease term.

18         •      Third, no published or unpublished case upholds a tax on a subject to which a

19  **tribe has added value**.  Where a tribe adds value to the subject of the tax, it has a strong

20  interest in maintaining those activities or subjects free from state interference and distinguishes

21  its situation from that of tribes that simply allow the sale of items such as cigarettes to take

22  place on their reservations.  *Cabazon*, 480 U.S. at 202.

23         Put otherwise, a tribe's "interest in raising revenues for essential governmental

24  programs . . . is strongest when the revenues are derived from value generated on the

25  reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal

26  services.  The State['s] . . . interest is likewise strongest when the tax is directed at off-

27  reservation value and when the taxpayer is the recipient of state services."  *Colville*, 447 U.S. at

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 32
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    156-157.

2        Crucially, here the County's tax is not levied on revenue generated from sales, but on

3    property – Trust Property Improvements belonging to a 51% tribal entity owner – constituting

4    literal value generated on tribal trust lands.  This case is not about whether the state can tax the

5    sale of cigarettes or other "non-tribal goods" to non-Indians, as in *Colville, Salt River* or other

6    Arizona cases; this case is about the attempted tax of Indian **property** – property the Tribe has

7    had a direct and active hand in developing, financing, and (literally) constructing.

8    **C.**    **The Interests of the United States and the Tribe Outweigh Those of the State.**

9        The Ninth Circuit has dealt primarily with two kinds of cases under *Bracker*; cases in

10   which (1) state taxes are preempted because Indian resources are involved, and (2) state taxes

11   are not preempted because tribes have contributed no value to the subject of the tax.  Consider

12   the Ninth Circuit's synthesis of the dichotomy in *Bracker* progeny, in *Crow Tribe Of Indians v.*

13   *Montana*, 819 F.2d 895, 900-902 (9th Cir. 1987) ("*Crow II*"), *summarily aff'd*, 484 U.S. 997

14   (1988): "Clearly, this case resembles *Cabazon* more than it does *Colville*.  The coal is the

15   Tribe's property, a natural resource.  Its lease brings revenue that represents value generated by

16   tribal activities and in which the Tribe has a substantial interest.  *Colville* does not apply."

17       For instance in *Crow II*, the Ninth Circuit found that the Supreme Court has

18   distinguished *Colville* from cases in which "the Tribe was trying to market a product generated

19   on the reservation by activities in which the Tribe had a strong interest."  819 F.2d at 899.

20   There, Montana was taxing a <u>wholly non-Indian</u> coal mining company, based on gross revenue

21   from extracted coal.  *Id.* at 897.  The Court noted that although the tax was on the non-Indian,

22   who simply mined tribal coal, the tax was preempted in part because: "The coal is the Tribe's

23   property, a natural resource. Its lease brings revenue that represents value generated by tribal

24   activities and in which the Tribe has a substantial interest. *Colville* does not apply."  *Id.* at 899.

25       In the instant matter, Indian resources and value are even more involved in the target of

26   the Taxes.  Here, (1) Indian resources, including the Property and its Lease, the Trust Property,

27   and tens of millions in Tribal dollars, are involved; and (2) the Tribe has contributed *significant*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 33
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

value to the subject of the Taxes, the Property, including the value of the Trust Property, the Lease and, again, millions in Tribal cash.  Therefore, as in *Crow*, this case is one in which state taxes should be preempted because Indian resources are involved in significant ways.

1.   **The United States And The Tribe Have Strong Interests In Tribal Economic Development.**

The *Bracker* analysis begins with an examination of relevant federal and tribal interests. "The federal government has expressed an interest in assisting tribes in their efforts to achieve economic self-sufficiency."  *Salt River*, 50 F.3d at 739.  "The promotion of tribal economic development has long been recognized as an important federal interest."  *Gila River Indian Community v. Waddell*, 91 F.3d 1232, 1237 (9th Cir. 1996) ("*Gila River II*"); *see also Cabazon*, 480 U.S. at 217 n. 20 ("It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government.").  Although a federal interest in helping tribes achieve economic self-sufficiency "does not, *without more*, defeat a state tax on non-Indians," here, several other federal and Tribal interests come to bear.  *Salt River*, 50 F.3d at 739 (emphasis added).

The federal and Tribal interests in the Tribe's economic self-sufficiency and self-determination are paramount in this case.  Galanda Decl., Ex. A, 3.  As the Regional Director of the BIA concluded relative to the United States' acquisition of the Trust property: "the Tribes plans to use the subject property for a hotel and convention center and thus, I further find that this acquisition of the land is necessary to facilitate tribal self-determination and economic development."  *Id.*, 2-3.  The BIA further concluded that the proposed project would provide the Tribe with revenue that could be used to:

- Strengthen the tribal government.
- Provide new tribal housing.
- Improve the quality of life of the tribal members by enabling the Tribes to fund a variety of social, governmental, administrative, education, health and welfare services.
- Provide capital for other economic development and investment opportunities.

As Professor Kalt has observed: "The Federal Government and the Chehalis Tribe have

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 34
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

parallel and compelling interests in the attempt by Thurston County to levy a personalty tax on

the Tribe's Great Wolf Lodge development project." Galanda Decl., Ex. L, at 32(IV)(A)(1).

> The federal interest, as expressed in its policies of self determination, include compelling interests in self-government and economic self-sufficiency for American Indian tribes. Achieving these ends requires that tribes develop the financial wherewithal to carry out federal objectives of effective self-government and economic self-sufficiency. . . .

> Similarly, for the Chehalis Tribe, meeting its citizens' needs for civil society and economic development in the contemporary era of federal policies of tribal self-determination requires effective tribal government. Effective tribal government, especially a self-sufficient tribal government, requires that the Chehalis Tribe develop and maximize the supporting and indispensable revenue streams upon which effective tribal government depends.

Galanda Decl., Ex. L, at 32.  Federal interests in tribal self-determination and economic

development are borne out in every piece of modern federal legislation and indeed, every

recent federal action, dealing with Indian tribes, as Professor Kalt observes.  Most notably, the

Indian Self-Determination and Education Assistance Act of 1975 (inspired by the Nixon

Administration) concisely sums up the strong federal interest in Chehalis Tribal economic

development as a manifestation of self-determination and with a view towards self-sufficiency:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy **that will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.** In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable governments, capable of administering quality programs and developing the economies of their respective communities (emphasis added). [13]

> The Tribe's joint venture ownership of a hotel, conference center and waterpark

exemplifies the federal interest in Tribal economic self-determination and in turn self-

---

[13] 34 P. L. 93-638 and US Code Chapter 14, Subchapter II, §450a.  *See also* the Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*; the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*, pursuant to which the Tribe adopted its Constitution, *discussed in Mescalero Apache Tribe v. Jones*, 411 U.S., 145, 152 (1973) (the "intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'"); the Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 *et seq.*, *discussed* in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62 (1978), (ICRA reflects Congress' intent "to promote the well-established federal 'policy of furthering Indian self-government.'").

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 35
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  sufficiency. Although the Tribe utilized the federal government's tools for tribal economic

2  development (i.e., the fee-to-trust process, the Trust Property and the federal Lease), no federal

3  dollars were used for the Lodge project, which is the essence of Indian self-sufficiency.

4          The structure of the joint venture with GWR, too, embodies the federal interests. Key

5  to the Lodge project was GWR's expertise and balance sheet, which allowed the Tribe to seek

6  the substantial funding necessary to construct the Property. With no Tribal property tax base,

7  and without substantial waterpark expertise, financing the Property would not have been

8  possible had the Tribe gone it alone; the Tribe needed GWR's balance sheet in the minority

9  equity position. So, rather than rely on federal funding to develop the Lodge, the Tribe

10  partnered with a reputable non-Indian company, which agreed to take a minority equity

11  position in the joint venture and the Property itself. The Tribe's initiative in this regard

12  embodies and epitomizes the federal and Tribal goals of Indian self-determination, i.e., the

13  "orderly transition from the Federal domination of programs for, and services to, Indians" to

14  "developing the economies of their respective communities." 34 P. L. 93-638.

15          **2.    The Tribe And The United States Regulate The Property In The Only Ways Material To This Case.**

16

17          Again, this case is about **property** taxes. The relevant questions about Tribal, federal

    and any County regulation, therefore, address regulation touching and concerning the Property.
18
    In short, only the United States and Tribe have regulatory authority over the Property;
19
    Defendant Thurston County and the State of Washington do not. Defendants may have
20
    jurisdiction over non-Indian criminal suspects at the Lodge by operation of federal law, but
21
    they have, and admit to having, no regulatory power over **the Property**. *See, e.g.,* Galanda
22
    Decl., Ex. JJ 78:6-22. The County's only interest in the Property is in raising revenue from its
23
    mere existence; Property which costs the County nothing and over which the County exercises
24
    no control. *See Bracker*, 448 U.S. at 174 (Powell, J., concurring).
25
            **a.    Plenary Tribal Authority Over The Property.**
26
            "Indian tribes are unique aggregations possessing attributes of sovereignty over both
27

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  their members and their territory." *Bracker*, 448 U.S. at 142, *quoting United States v. Mazurie*,

2  419 U.S. 544, 557 (1975). As sovereigns, tribes and their trust lands are "insulated in some

3  respects by an historic immunity from state and local control," *Mescalero Apach*e, 411 U.S. at

4  152, and tribes retain any aspect of their historical sovereignty not "inconsistent with the

5  overriding interests of the National Government." *Colville*, 447 U.S. at 153.

6          These traditional notions of Indian sovereignty provide a crucial "backdrop" for the

7  *Bracker* test here. 448 U.S. at 143. Tribal sovereignty includes and is embodied in the Tribe's

8  undisputed, plenary regulatory authority over the Property. Consider the following Tribal

9  regulations by which the Tribe directly regulates the Property.

10                 i.    Tribal Construction Regulations. The Tribe regulated every

11  aspect of construction of the Property. As part of the construction of the Property, the Tribe –

12  not the County – issued electrical, building and utility permits to every contractor or sub-

13  contractor involved in the project. The Tribe employed a full-time building inspector to ensure

14  that Tribal Building Code standards were adhered to during construction; to that end, the Tribe

15  cited Absher during the course of construction for a Tribal Building Code violation. Tribal

16  (not state) construction safety regulations governed the safety of construction workers.

17                 ii.   Tribal Land Use Regulations. Defendants do not dispute that

18  only the Tribe's land use laws apply to the Property. Galanda Decl., Ex. JJ 78:6-22. Several

19  Tribal laws dictate how the Property was constructed and located on the Trust Land, e.g., the

20  Tribe's Flood Damage Prevention Ordinance; Permitting Code; Zoning Ordinance; Natural

21  Hazards Mitigation Plan; Comprehensive Flood Hazard Management Plan; and

22  Comprehensive Emergency Management Plan. Burnett Decl., ¶¶ 41-45. Further, the Tribally

23  funded, and County-published Grand Mound Development Plan addresses not only the Trust

24  Land, but the land surrounding the Lodge:

25          The Confederated Tribes of the Chehalis Reservation (Tribe) initiated this
            planning effort **at the request of Thurston County (County)** to start a
26          community conversation and develop a vision for the future of Grand Mound
            while the area still has a significant amount of undeveloped land and a wide
27          range of opportunities.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 37
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    Galanda Decl., Ex. N, at i (emphasis added).  Put otherwise, with regard to laws that actually

2    concern *the Property* – zoning, planning and use – only Tribal laws govern.  And even with

3    regard to how the Property fits into the Grand Mound area, the most profound planning in that

4    regard has come from the Tribe.

5                    iii.    Tribal Tax Laws.  Outside of the Taxes in dispute, no property

6    taxes are assessed on the Trust Property or Property because the Tribe does not assess taxes on

7    real or personal property as a matter of Tribal law.  The Tribe assesses a 3% room and a 3%

8    sales tax on Lodge patrons, to the exclusion of state excise taxes.

9          One would be hard-pressed to find any other tribal government who has regulated tribal

10   lands and a business enterprise – whether tribally owned or not – as comprehensively as the

11   Chehalis Tribe regulates the Trust Property and the Lodge.

12           **b.     Comprehensive Federal Regulation Of The Trust Acquisition.**

13         As outlined in depth as a factual matter, the Tribe's conveyance of its land into trust

14   was heavily regulated by the Federal Government.  The United States' acquisition of the 42.99

15   acres was the subject of a 14-page set of Findings of Facts and Conclusions of Law rendered

16   by the BIA.  Galanda Decl., Ex. A.  And the Lodge, which is permanently affixed to the Trust

17   Property, was specifically contemplated in the United States' fee-to-trust acquisition.

18           **c.     Comprehensive Federal Regulation Of The Lease.**

19         In addition to the fee-to-trust acquisition, the United States regulates the Lease of the

20   Trust Property, for the Property.  As the Ninth Circuit held in a sales tax case, the federal

21   tribal-land-lease regulations comprehensively regulate the Lodge project:

22        [25 U.S.C.] Section 415 establishes a federal regulatory scheme governing the
          leasing of tribal lands similar to that described by the *Bracker* Court as
23        controlling the harvesting of Indian timber.  It provides that the Secretary of the
          Interior must authorize all leases of reservation property, and establishes certain
24        factors which the Secretary must consider before giving approval.  **Included
          among these factors are the uses to which the land will be put and the effect
25        of those uses on neighboring tribal property, the availability of services
          appropriate to the maintenance of the uses, and the quality and safety of
26        any structures to be erected pursuant to the leases . . .** [T]he Secretary has
          also promulgated detailed regulations governing leasing to ensure "the highest
27        economic return to the [tribal] owner consistent with prudent management and
          conservation practices . . ." 25 C.F.R. § 162.8 (1991). These regulations govern

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:           **Williams, Kastner & Gibbs PLLC**
*BRACKER* PREEMPTION - 38                              601 Union Street, Suite 4100
(C08-5562)                                             Seattle, Washington 98101-2380
2719364.11                                             (206) 628-6600

the length of leases and the terms under which leases will be approved. 25 C.F.R. §§ 162.1-162.14 (1991). **They are of a scope and detail sufficient to support an argument that, as the Supreme Court held in *Bracker* and *Ramah*, there exists no room for additional regulation by the State.**

*Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1411 (1992) ("Gila River I") (emphasis added).[14]   The federal regulation of the Lease represents an even more profound basis for preemption here since Defendants' tax directly targets the Leased premises: the Property, which Defendants admit is permanently affixed to the Trust Property.

### d.    Complimentary Federal Regulation Of The Property.

The federal government regulates other aspects of the Property through annual inspections "since it is located on Chehalis Tribal Land." Burnett Decl., Ex. 14.  For instance, in July 22, 2009, the physical safety of the Lodge was inspected by the U.S. Department of Health and Human Services' Indian Health Service. *Id.*  The Property that Defendants seek to tax is the subject of ongoing federal inspection and safety regulation.

### e.    Tribal Self-Determination In Place Of Federal Control.

The federal government has conferred its public service responsibilities in Indian Country, to the Tribe pursuant to Public Law 93-638.  As such, the Tribe in turn provides public services like primary law enforcement to the Lodge, which Defendants seek to tax.

### 3.    The Tribe Has An Enterprise Interest In The Property.

**Defendants cannot point to a single case in which state taxes have been upheld on an allegedly "non-Indian" taxpayer possessing any degree of tribal ownership.**  Indeed, the Tribe's interests here are more profound than in <u>any</u> previous *Bracker* case.

Tribes have an "interest in raising revenues for essential governmental programs, [and] that interest is strongest when the revenues are [1] derived from value generated on the

---

[14] In the sales tax context, the Ninth Circuit later observed: "In *Salt River*, this court rejected the argument that leasing statutes required preemption of the Arizona tax on retail sales and rents received from subtenants. . . . Arizona sales tax would not interfere with the use and development of the Tribe's property. Thus, the regulatory scheme that governs the leasing of Indian lands does not require the preemption of the tax." *Gila II*, 91 F.3d 1232, 1237 (9th Cir. 1996).  Yet, the *Salt River* court did <u>not</u> reject the argument that leasing statutes required preemption.  50 F.3d at 737-739.  Moreover, the state taxes at issue in *Gila River I* were taxes on sales by non-Indians to non-Indians; again, no such state taxes have been assessed against CTGW.  Here, Defendants' Taxes directly target the Property and would necessarily interfere with the use and development of the Property.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 39
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Comment [PC3]:

Comment [PC4R3]: WHERE IS THE REST OF THE FOOTNOTE.

1   reservation [2] by activities involving the Tribes and [3] when the taxpayer is the recipient of

2   tribal services." *Salt River*, 50 F.3d at 737, *citing Colville*.

3       Here, first, the Tribal 51% share of CTGW net profits and the Tribe's tax revenues

4   literally constitute revenues generated on the reservation, i.e., from the Trust Property. *Crow I*,

5   ("the state's interest in acquiring revenues is weak in comparison with <u>the Tribe's right to the</u>

6   <u>bounty from its own land.</u>"). 650 F.2d at 1117 (emphasis added). Those revenues were

7   generated through the activities of the Tribe, both as a government and majority equity owner

8   of CTGW, in the development, financing, and construction of the Lodge. Second, Tribal

9   activities in the Property are exemplified by not just the Tribe's active role in the development

10  and financing of the project, but the several Tribal member Saxas employees who physically

11  helped build the Lodge and the 25 Tribal members who have worked there since 2008. And

12  third, the taxpayer here, CTGW, is the recipient of an abundance of Tribal services such as

13  zoning and building code permitting and inspections, primary law enforcement, Tribal

14  employee preference, and health and safety governance.

15      As such, the Tribe's interest in raising revenues for essential governmental programs is

16  at its strongest, and is directly affected by the Taxes. Indeed, Defendants have conceded that

17  their Taxes "fall on the Tribal interests," as observed at the outset of this Motion. Dkt. 13, p. 9.

18  Plaintiffs agree: The Taxes would necessarily and actually harm the Tribe: Taxes would be

19  paid as operational expenses of CTGW and thereby reduce "Available Cash" for distribution to

20  the Tribe and GWR "in proportion to their respective Proportionate Shares," 51% and 49%

21  respectively. Burnett Decl., Ex. 1, 3. As explained by Professor Kalt:

22          The economic reality is that, per the terms of the LLC ownership agreement,
            earnings from Great Wolf Lodge are paid proportionately to the majority and
23          minority owners respectively, net of taxes. Thus any levy, regardless of the
            magnitude of any discount (say, to 49%) that might be offered by the County off
24          the otherwise fully assessed value of the improvements, would be an operational
            expense paid out of pre-tax revenues. This would reduce net income
25          distributable to the owners and they would both bear their proportionate shares
            of the County's tax levy. . . . **The economic effect of the tax would then be to**
26          **reduce directly the amount of monies available to the Chehalis Tribal**
            **Government for meeting its responsibilities to its citizens under federal**
27          **policies of tribal self-determination through tribal self-government.** This
            can only have a negative effect on the capacity of the Tribal Government to

1  meet the needs of its citizens and maintain the functions necessary to create an
2  environment that promotes societal well-being and sustainable economic
   activity.

3  Galanda Decl., Ex. L, 42(emphasis added).  The Taxes would impact the Tribe directly; this is

4  not a case in which taxes paid by a non-Indian contracting party or lessor would make a tribe's

5  business relationship less favorable or more expensive.  Rather, the Taxes will directly reduce

6  Tribal revenue for governmental programs and services and as 51% owner, affect the Tribe

7  more than GWR.

8     **4.    Defendants Have Identified Few, If Any Interests In Taxing The Property.**

9         **a.    Plainly and Simply:  Revenue Raising.**

10        States have a "legitimate governmental interest in raising revenues" but that interest is

11  "strongest when the tax is directed at off-reservation value and when the taxpayer is the

12  recipient of state services." *Colville*, 447 U.S. at 157.  At the outset of this case, and at every

13  opportunity since, Defendants have contended that the state interest to be balanced against the

14  Tribal and federal interests was the State's interest in revenue to support services.

15        In considering the state interests in taxation, the state has a strong interest in
16        collecting property taxes to fund state and local government services. . . . The
      levies included in the property taxes assessed on the improvements at the Great
17      Wolf Lodge include those for state and local schools, the county, Medic One,
      county roads, Timberland library, the Port of Olympia, fire district, cemetery
18      district and public utility district.  Dkt. 13, 7:12-16.

19  Defendants were given the opportunity to expound upon their interests during discovery:

20        Interrogatory No. 13: What State or County interests do you contend are
      affected by the payment or nonpayment of the Personal Property Taxes?
21
22        Answer: [objections omitted] The interests of the following taxing districts are
      supported by proceeds from personal property taxes: Washington State Schools,
      Thurston County, Thurston County Roads, Medic One, Port of Olympia,
23      Timberland Library, Rochester School District, Fire District #1, Cemetery
      District #1, and PUD #1.
24
25  Galanda Decl., Ex. S, at 17.  As the Court now engages in a *Bracker* analysis, Defendants,

26  through their own admissions, have identified their only interests to be weighed as revenue

27

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 41
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    generation for funding of the above-stated state and local services.[15]

2         The Assessor ignores the fact that under RCW 84.52.018 and as detailed below, the

3    taxing districts identified by the County will receive the same amount of funds regardless of

4    CTGW's payment of other Taxes, because the County's levy amount and the total assessed

5    property value are **required under state law** to be set without taking the Lodge into

6    consideration.   The Assessor's position makes clear that the only County interest here is

7    general revenue raising, which, in light of the Ninth circuit authority cited below, is insufficient

8    to overcome preemption under these facts.

9         CTGW does no business in Washington State outside the Trust Property.  As to the

10   interests the County erroneously contends are affected by the nonpayment of the tax, designees

11   from nine agencies that the Defendants attested each provide services to the Lodge, testified

12   that those agencies provide no such services:  **The Cemetery District #1, Port of Olympia,**

13   **Roads Department, Juvenile Service, Superior Court, Clerk's Office, Office of Assigned**

14   **Counsel and Mapping Services, provide no services to CTGW, and the County's Coroner**

15   **has provided no services to the Lodge.**   Any other services provided to CTGW or the Lodge

16   are de minimis, as discussed above and below, and strongly counsel for preemption.

17        Further, Defendants have failed to identify any services provided to CTGW except

18   those provided to CTGW employees or customers.  In other words, not even Defendants

19   contend that the County or its taxing districts serve CTGW itself.  Rather, they claim CTGW

20   "benefits" from the services provided to its customers and employees.  *See* Dkt. 100 17-22.

21   But critically, the *Bracker* inquiry, under a rule derived in *Salt River*, does not concern whether

22   local services are provided to CTGW's customers and employees, but whether any local

23   services are provided *to the non-Indian taxpayer*, here, the LLC.  50 F.3d at 734.  The *Salt*

24   *River* rule operates here as follows: State interests regarding the Taxes on the Lodge are weak

25   because, although CTGW would be taxed, revenue from the Taxes will <u>not</u> be used to provide

26

27   ───────────────
     [15] Defendants will no doubt seek to interject additional state or local interests on summary judgment but they
     should be estopped from doing so.

     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:                    **Williams, Kastner & Gibbs PLLC**
     *BRACKER* PREEMPTION - 42                                      601 Union Street, Suite 4100
     (C08-5562)                                                     Seattle, Washington 98101-2380
     2719364.11                                                     (206) 628-6600

the Tribe or CTGW with local governmental services.  Preemption is appropriate.

   **b.**   **De Minimis Local Services To The Lodge; Without A Nexus To The Taxes.**

   The state interest strengthens where there is a nexus between the taxed activity and the government function provided.  *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1193 (9th Cir. 2008).  "Where strong federal and tribal interests exist the State's taxes ha[ve] to be narrowly tailored to funding the services that the State provided in connection with the activities taking place on the reservation."  *Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1111 (9th Cir. 1997) (quotations, citations omitted).  Although there is no *requirement* that a "tax imposed on non-Indians for reservation activities be proportional to the services provided by the State," *Gila River II*, 91 F.3d at 1239, the State must "demonstrate a close relationship between the tax imposed on the on-reservation activity and the state interest asserted to justify such tax." *Cabazon*, 37 F.3d at 435.

   For the purposes of this Motion, facts are to be viewed in the light most favorable to Defendants.  Through testimony of Defendants, however, it is clear that local government provides de minimis services to activities at the Property.  Only the Sheriff and Medic One could arguably be seen as providing direct services to CTGW.  The Sheriff provides some law enforcement, i.e., secondary response and arrest of any non-Indian perpetrators, to the Property, because the Tribe can detain but not arrest non-Indians under *Oliphant, infra*.  Still, the Sheriff's secondary law enforcement at the Lodge has caused little if any impact the County according to the Sheriff and Undersheriff; and such impact is offset by the Tribe's payment of over $50,000 per year to the County for the Sheriff's Countywide services.

   The Tribe likewise pays Fire District #1 $160,000 for fire and emergency services.  The Tribe originally contracted to pay Fire District #1 for "Emergency Services," which then appeared to cover Advanced Life Support (ALS) services.  When Medic One contracted with the District to provide ALS services, the Tribe received Medic One's ALS services under its fee-for-service agreement with Fire District #1.

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    As Medic Once has since stopped contracting with Fire District #1 for ALS, the Fire

2   District, or the County on its behalf, will likely contend that the Tribal-Fire District agreement

3   does not cover ALS calls, and thus, the Lodge impacts Medic One.  Still,  Medic One has had

4   only eleven ALS calls at the Lodge in 2009, several of which have been downgraded to BLS

5   calls contemplated under the Tribal-Fire District fee-for-service agreement.  Medic One

6   testified that calls cost an average (but notably, not an incremental) of $944 per call, which

7   amounts to $10,384 for its eleven calls to the Lodge.  Galanda Decl., Ex. EE 28:9-25.

8    Viewing other County and taxing district services in a light most favorable to local

9   government, there are de minimis services occasionally provided to the Tribe or CTGW; again:

10  • Eleven Medic One calls, some of which were downgraded to BLS;
    • CAPCOM's mere referral of emergency calls to the Tribal Police or Fire District
11    #1, which the Tribe in turn either handles or pays local government to handle;
    • One food-borne illness complaint that was referred to the United States;
12  • A recorded deed of trust filed by the LLC's financiers;
    • Four garnishment actions in which CTGW was a passive third party;
13  • The prosecution of a single incident of theft at the Lodge;
    • The Lodge's one-time use of a School District lot for overflow parking; and
14  • Road plowing, beyond the Trust Property, during one snow event.

15   With regard to the Sheriff and Medic One, and any other demonstrable County service

16  impacts caused by CTGW or the Lodge, if even de minimis, the Tribe has offered on multiple

17  occasions to reimburse the County under a negotiated interlocal agreement.  Although that is

18  how the Tribe and County handled water/sewer and road improvements relative to the Lodge,

19  in symbiotic fashion, the County ignores the Tribe's current fee-for-service offer.

20           c.    **Off-Reservation Local Services And "Spillover" Costs Are
                   Irrelevant.**
21
22   Local government surely provides services to tax-paying Lodge patrons and employees,

23  off trust land, but any associated "spillover" costs have no effect in the *Bracker* analysis:

24       ***Ramah* instructs that services provided outside a reservation are <u>not</u> to be
         taken into account in *Bracker* balancing.**  *Ramah*, 458 U.S. at 844.  As in
25       *Ramah*, the revenues from taxing the activities of operators extracting oil and
         gas outside the New Mexico lands are presumably enough to recompense the
26       State for its provision and regulation of the infrastructure.  *Id.* at 844 n.9.  In
         *Bracker*, the economic value of tribal timber would likely have been minimal in
27       the absence of Arizona state roads outside the White Mountain Apache
         Reservation to transport the timber to market, but those state roads played no
         part in the analysis.  *See Bracker*, at 146-52.  Here, the physical infrastructure

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 44
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

and services off the New Mexico lands provided and regulated by the State of New Mexico should similarly play no part in the analysis.

*Ute Mountain v. Homans*, ___ F.Supp. ___ ; No. CIV 07-772 JP/WDS (D.N.M. 10/2009) (emphasis added).  Likewise, any physical infrastructure and services off the Trust Property provided and regulated by the County (or State) should play no part in the Court's analysis.

In *Hoopa Valley Tribe v. Nevins*, the Ninth Circuit preempted timber yield taxes on non-Indian timber harvesters.  881 F.2d 657, 661 (9th Cir. 1989).  California pointed to a variety of services provided to residents in the surrounding area, using the proceeds of the preempted taxes.  Id. at 661.  881 F.2d 657, 661 (9th Cir. 1989).  As the Court observed, "The services provided by the state and county are provided to <u>all residents</u>.  The road, law enforcement, welfare, and health care services provided by the state and county benefit both tribal and non-tribal members.  California admits that there is no direct connection between revenues from the timber yield tax and the provision of services to tribal members or area residents generally."  881 F.2d 657, 661 (9th Cir. 1989).  Here, as in *Hoopa*, there is no direct relation between the Taxes and the Property.

The Ninth Circuit made clear that to be valid, a state tax must bear some relationship to the activity on trust lands being taxed.  *Id.*; *see also Crow II*, 819 F.2d at 900.  Raising revenues for services used by tribal residents and the neighboring non-tribal community (again, who are not the subject taxpayers), is an insufficient state interest to overcome preemption.  *Id.* at 901.  What's more, where a tax affects a tribe's ability to generate value from its trust lands, as here, the Ninth Circuit has severely undercut generalized fundraising as valid state interest. *Crow I*, 650 F.2d at 1117 ("To the extent that this [coal severance] tax is not related to the actual governmental costs associated with the mining of the Indian coal . . . the state's interest in acquiring revenues is weak.") (emphasis added); *Hoopa*, 881 F.2d at 661.

Here, with any local off-Trust Property infrastructure and services irrelevant to the Court's analysis, any other local interests are decidedly weak in comparison with the Tribe's trust land-based interests.  Such is particularly true since the Tribe either currently defrays or

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 45
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    has offered to defray any costs that local government might bear relative to the Lodge.

2        In short, the Taxes are not narrowly tailored to fund any services the County provides to

3    the Tribe or CTGW in connection with activities on the Property. *Salt River*, 50 F.3d at 737;

4    *Yavapai-Prescottt*, 117 F.3d at 1111; *Cabazon*, 37 F.3d at 435. The Taxes embody nothing

5    more than the County's general desire to increase revenue, which, once again, is insufficient to

6    overcome preemption as a matter of federal law.

7        **5.    Defendants' Only Stated Interest Is Undercut By Function Of State Law
              And The Economic Reality That The Lodge Benefits Defendants.**

8

9        Even if the Court were to give credence to Defendants' revenue-raising interests, under

10   state law, such interests are not affected by CTGW's payment or nonpayment of the Taxes.

11   The County tax rate is calculated by dividing the total levy amount by the amount of taxable

12   property in the district. WAC 458-19-020. Pursuant to RCW 84.52.018, the County's annual

13   tabulation of total taxable property does not include the Lodge or any other tax-disputed

14   properties accounting for greater than one quarter of 1% of the total assessed value of property

15   Countywide. Galanda Decl., Ex. II. Critically, this statutory restriction means that the County

16   and local taxing districts cannot, have not, and will not experience any reduction in monies

17   paid to them because of Plaintiffs' refusal to accede to the Taxes they believe are illegal.

18       Recall the previously discussed Assessor discovery responses concerning "'the small

19   taxing entities' whose ability to provide services [Defendants] contend will be limited by 'the

20   loss of property tax'," again, the State and County, as well as Medic One, Port of Olympia,

21   Timberland Library, Fire District #1, Cemetery District #1, and PUD #1. Yet the Assessor

22   ignores the fact that under RCW 84.52.018, the County and nearby taxing districts will receive

23   the same amount of funds regardless of CTGW's payment or dispute of the Taxes! Why?

24   Because, again, uniformly applied state law requires the amounts of the County levy and tax

25   rolls to be set by the Assessor without taking the Lodge into consideration.

26       As such, the County's only real interest in the Taxes is general revenue raising, which

27   again, is insufficient under Ninth Circuit law and again, counsels for preemption. And,

---

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 46
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1  assuming arguendo, that general County revenue raising is a legitimate state interest, as

2  Professor Kalt observes, the County reaps the benefit of a 14% increase in properties near the

3  Property and tens of millions of dollars in positive economic impact from the Lodge.

**VII.  CONCLUSION**

5      This is not a *Colville*-type case, wherein according to the Ninth Circuit, "tribes were

6  merely marketing their exemption from state cigarette taxes." *Crow II*, 819 F.2d at 899.  Here,

7  the Tribe is "not merely importing a product onto the reservations for immediate resale to non-

8  Indians." *Gila I*,  967 F.2d at 1410-1411.  Instead, this case is akin to Ninth Circuit cases in

9  which "the Tribe was trying to market a product generated on the reservation by activities in

10  which the Tribe had a strong interest"; cases in which "the Indians had invested considerable

11  time and resources into the enterprise"; cases in which state taxes were preempted.  *Crow II*,

12  819 F.2d at 899.

13      Defendants will no doubt attempt to cast this case as in the *Colville-Barona* continuum.

14  But the Chehalis Indians cannot in good faith be described as "merely marketing their

15  exemption" from Defendants' Taxes.  The Tribe leveraged a product generated on the

16  reservation; in fact, the Tribe leveraged the land itself – the Trust Property – into CTGW and

17  the Lodge.  The Tribe did so through activities in which it had a strong interest, from

18  development, to financing, to construction, with Tribal members actively involved every step

19  of the way; the Lodge was built at the hands of Tribal construction workers and today Tribal

20  members help operate the Property.  It cannot be denied that the Tribe invested, and continues

21  to invest, *considerable* time and resources into the enterprise, both the LLC and the Lodge.

22      Here, as in *Crow II* and *Hoopa*, because the Tribe has added *substantial* value to the

23  subject of the Taxes – the Property – the Tribe and the United States have a strong interest in

24  keeping the Lodge free from state interference.  *Colville*,  447 U.S. at 156-157.  The Tribe's

25  interest in generating revenues for Tribal programs and services has reached an apex, (*id.*)at its

26  $170 million Great Wolf Lodge – something that should be heralded, not taxed.

27      Indeed, the County cannot show any nexus between its Taxes and the Property.  A

1    recent County tax assessment document shows that 31.8% of the Taxes on the Lodge would go

2    to Rochester School District and another 21.5% to the State of Washington State School

3    system.  Galanda Decl., Ex. O.  The Rochester School District, which, even before the Taxes

4    were assessed, received thousands of dollars from the Tribe, United States and CTGW as a

5    result of the Tribe and Lodge, cannot be said to have a "close relationship" with the Property

6    insofar as CTGW is concerned.  *Cabazon*, 37 F.3d at 435.  Washington State School system

7    provides no services in connection with the activities taking place on the reservation.  *Yavapai-*

8    *Prescott*, 117 F.3d at 1111.  The County's general revenue-raising Taxes, over 50% of which is

9    for non-Tribal schools, though noble, cannot conceivably have the nexus to the Property

10   required by the Ninth Circuit in order to withstand preemption.  *Crow II*, 819 F.2d at 900.

11   Preemption of the Taxes is appropriate.

12            Defendants cannot reasonably contend that there are any genuine disputes as to facts

13   material to this Motion.  Because Plaintiffs are entitled to judgment as a matter of federal law,

14   namely *Bracker* and its progeny, summary judgment is the appropriate way to efficiently

15   resolve this matter.  A proposed Order is filed herewith.

16            DATED this 31st day of December, 2009.

17    _/s Harold Chesnin, WSBA #398_                    __/s Gabriel S. Galanda, WSBA #30331_

18    Harold Chesnin, WSBA #398                         Debora Juarez, WSBA # 17199
      General Counsel to the Tribe                      Gabriel S. Galanda, WSBA # 30331
      1810 – 43rd Avenue E. #203                        Anthony S. Broadman, WSBA # 39508

19    Seattle, WA 98112                                 WILLIAMS KASTNER
      Telephone:  360-661-1020                          601 Union Street, Suite 4100

20    Fax:  206-861-8116                                Seattle, WA  98101-2380
      Email:  pateus@aol.com                            Telephone:  (206) 628-6600

21    Attorney for Plaintiffs                           Fax:  (206) 628-6611
                                                        Email: djuarez@williamskastner.com

22                                                      Email: ggalanda@williamskastner.com
                                                        Email:abroadman@williamskastner.com

23                                                      Attorneys for Plaintiffs

24

25

26

27

CERTIFICATE OF SERVICE

I, Gabriel S. Galanda, say:

1.    I am now, and at all times herein mentioned, a citizen of the United States, a resident of the State of Washington, over the age of 18 years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

2.    On 31st day of December, 2009, I electronically filed the following documents with the Clerk of the Court using the CM/ECF system:

- PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE: *BRACKER* PREEMPTION;
- DECLARATION OF GABRIEL S. GALANDA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE: PREEMPTION (with Exhibits A-KK, Exhibit E is filed Under Seal);
- DECLARATION OF CHAIRMAN DAVID BURNETT RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (with Exhibits 1-17, Exhibits 1, 5 and 6 are filed Under Seal);
- DECLARATION OF JAMES MAY;
- PROPOSED ORDER

which will send notification to the following via e-mail:

David V. Klumpp:  klumppd@co.thurston.wa.us; olsenl@co.thurston.wa.us

Jane Futterman:  futterj@co.thurston.wa.us; olsenl@co.thurston.wa.us

Scott C. Cushing:  cushins@co.thurston.wa.us

James Richmond:  jim@richmondlawgroup.com

DATED this 31st day of December, 2009.

__/s Gabriel S. Galanda, WSBA #30331
WILLIAMS KASTNER
601 Union Street, Suite 4100
Seattle, WA  98101-2380
Telephone:  (206) 628-6600
Fax:  (206) 628-6611
Email:  ggalanda@williamskastner.com

Attorneys for Plaintiffs Confederated Tribes of the Chehalis Reservation and CTGW, LLC

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE:
*BRACKER* PREEMPTION - 49
(C08-5562)
2719364.11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600