UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THURSTON COUNTY BOARD OF EQUALIZATION, et al.,<br><br>Defendants. | CASE NO. C08-5562BHS<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE: *BRACKER* PREEMPTION |

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. 100) and Plaintiffs' Motion for Summary Judgment Re: *Bracker* Preemption (Dkt. 107). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants Defendants' motion and denies Plaintiffs' motion for the reasons stated herein.

**I. PROCEDURAL BACKGROUND**

On September 18, 2008, Plaintiffs Confederated Tribes of the Chehalis Reservation ("Tribe") and CTGW, LLC ("CTGW") filed a complaint against Defendants Thurston County Board of Equalization; equalization board members John Morrison, Bruce Reeves and Joe Simmonds; Thurston County Assessor Patricia Costell; and Thurston County. Dkt. 1. Plaintiffs alleged that Defendants are violating the U.S.

ORDER - 1

Constitution as well as federal common law by imposing a personalty tax on CTGW's facility, the Great Wolf Lodge ("Lodge"). *Id.* ¶ 1.

On March 9, 2009, Plaintiffs filed a First Amended Complaint for Declaratory and Injunctive Relief. Dkt. 46 ("Amended Complaint"). Plaintiffs assert five causes of action that are summarized as follows: (1) Defendants' attempt to levy and collect taxes is *per se* invalid, (2) Defendants' taxes are preempted under *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), (3) Defendants are interfering "with Plaintiff Tribe's inherent sovereign right of self-governance," (4) Defendants are acting *ultra vires*, and (5) Defendant Thurston County assessor is action contrary to the Washington Department of Revenue. Dkt. 46, ¶¶ 41-61. On July 2, 2009, the Court dismissed Plaintiffs' fifth claim for relief. Dkt. 61.

On December 31, 2009, Defendants filed a Motion for Summary Judgment (Dkt. 100) and Plaintiffs' filed a Motion for Summary Judgment Re: *Bracker* Preemption (Dkt. 107). On January 4, 2010, Plaintiffs filed a revised version of their motion. Dkt. 113-2. On January 19, 2010, both parties responded. Dkts. 125 and 129. On January 22, 2010, both parties replied. Dkts. 133 and 134.

On March 22, 2010, the Court held a hearing on the cross-motions for summary judgment. Dkt. 178.

## II. FACTUAL BACKGROUND

**A.   The Lodge**

The Tribe occupies a reservation at the confluence of the Black and Chehalis Rivers in Southwest Washington ("Reservation"). *Confederated Tribes of the Chehalis Indian Reservation v. State of Washington*, 96 F.3d 334, 338 (9th Cir. 1996). The Reservation, which was created by Secretarial Order in 1864, was set aside for "the use and occupation of the Chehalis Indians." 1 Kappler, *Indian Affairs, Laws and Treaties* 901-04 (2d ed. 1904). The Tribe has approximately 800 members, which include persons descended from the Upper Chehalis, the Lower Chehalis, Cowlitz, Satsop, Qualioqua and

other aboriginal tribes of Southwest Washington. Dkt. 108, Declaration of Chairman Burnett, ¶ 3 ("Burnett Decl.").

In 2005, the Tribe and Great Wolf Resorts, Inc. ("Great Wolf"), a non-Indian corporation with water park expertise, formed CTGW, a limited liability company, under Delaware law, for the purpose of building and owning the Lodge. *Id*. ¶ 8.

> [The Lodge] began operations in March 2008. It consists of 398 all suite guest rooms, restaurants, and related retail and services operations, 78,000 square feet of indoor entertainment area largely consisting of an indoor water park, a 30,000 square foot conference center, a 10,800 square foot ballroom, various meeting rooms, a business center, and catering services.

Dkt. 110, Declaration of Gabriel S. Galanda ("Galanda Decl."), Exh. L, Expert Report of Joseph P. Kalt at 10 (report pagination). The Lodge cost approximately $172 million to build and neither federal loans nor federal guarantees were used to build or develop it. Dkt. 146 at 4-5. Great Wolf and the Tribe borrowed $102 million from the Marshall Financing Group with the Tribe guaranteeing repayment of 51%. *Id*. at 5.

The Lodge is located on 42.99 acres of land that was originally held in trust by the United States for the benefit of the Tribe. Burnett Decl., ¶ 14; *see also id*., Exh 2. On March 16, 2010, the U.S. Department of the Interior, Bureau of Indian Affairs, issued a Notice of Reservation Proclamation that the 42.99 acres held in trust "was proclaimed to be an addition to and part of the Chehalis Indian Reservation for the exclusive use of Indians on that reservation . . . ." 75 FR 12565-01. In other words, the land that the Lodge is on is now part of the Tribe's reservation land.

The Tribe leases land to CTGW under an agreement that was approved by the Secretary of the Interior. Dkt. 3, Exh. A, U.S. Dept. of the Interior Business Development Lease (recorded by the Bureau of Indian Affairs on July 2, 2007) ("Lease"). The lease agreement between the Tribe as Lessor and CTGW as Lessee contains a provision regarding improvements that reads as follows:

> All buildings and improvements on the Premises shall be owned in fee by the Lessee during the term of this Lease provided that such buildings and improvements (excluding removable personal property and trade

ORDER - 3

> fixtures) shall remain on the Premises after the termination of this Lease and shall thereupon become the property of the Lessor.

Lease, Art. 11.

Under the CTGW operating agreement, the Tribe has a majority "proportionate share" of CTGW's profits of 51%, and Great Wolf receives the remaining 49% of CTGW's profits. Burnett Decl., Exh 1 at 12 (definition of "Proportionate Share"). Defendants claim that when the preempted taxes and leased land are accounted for, the resulting percentage split is 69% for Great Wolf and 31% for the Tribe. Dkt. 100 at 14. The LLC agreement makes Great Wolf the "Managing Member" of the LLC. Burnett Decl., Exh 1 at 29. The agreement further states that the Managing Member

> shall have the power and authority to conduct the business and affairs of the Company. Without limiting the generality of the foregoing, but subject to the other provisions of this Agreement, the Managing Member (i) shall have the authority to execute all agreements, contracts, leases, mortgages and other instruments on behalf of the Company and (ii) shall be responsible for performing or causing to be performed (and shall have the authority to perform, subject to the other provisions of this Agreement), all actions and services which it is the manager's obligation to perform under the Management Agreement.

*Id*.

With regard to employment at the Lodge, the parties have submitted different figures to the Court. Taking the numbers in the light most favorable to Plaintiffs, it seems that the Lodge employs over 500 workers, with approximately 25 Tribal members having been employed there since March 2008. Dkt. 113-2 at 24, ¶ 118.

With regard to management of the Lodge, CTGW, as "Owner," and Great Lakes Services, LLC, as "Manager," entered into a Management Services Agreement. Burnett Decl., Exh. 5. The provision of the agreement titled "Operation of Lodge" reads in part as follows:

> Owner hereby authorizes and engages Manager to act as the exclusive operator and manager of the Lodge during the Term, with exclusive responsibility and complete and full control and discretion in the operation, direction, management and supervision of the Lodge, subject only to the limitations expressed in this Agreement, and Manager hereby accepts such engagement subject to the terms and conditions expressed in this Agreement. Owner hereby covenants that **it will not interfere or involve itself in any way in the day-to-day**

ORDER - 4

> **operation of the Lodge** except to the extent specifically permitted in this Agreement.

*Id.*, § 2.5 (emphasis added).

## B.     State Taxation

In Washington, all property is subject to assessment and taxation unless exempted by law. RCW 84.36.005. "[P]ersonal property," for purposes of taxation, includes "all improvements upon lands the fee of which is still vested in the United States." RCW 84.04.080. Washington exempts "all property belonging exclusively to any federally recognized Indian tribe located in the state, if that property is used exclusively for essential government services . . . ." RCW 84.36.010(1). "Essential government services" is defined as "services such as tribal administration, public facilities, fire, police, public health, education, sewer, water, environmental and land use, transportation, and utility services." RCW 84.36.010(2).

In 2007, the Assessor assessed and levied taxes on the improvements when the Lodge was partially complete. The assessed value of the improvements was $20,643,800. Galanda Decl., Exh. O. The Assessor then split the taxes in accordance with the Tribe's 51% ownership interest and Great Wolf's 49% ownership interest in CTGW. As a result of that split, the Assessor found that $98,143.56 was exempt and that $94,294.80 was due. *Id*. The Assessor also informed CTGW that the distribution of the amount due was as follows: Public Utility District #1, $76.41; Cemetery District #1, 422.50; Port of Olympia, $1,536.25; Medic One, $2,931.76; Timberland Library, $3,456.43; Thurston County, $10,958.51; County Road, $11,630.62; Fire District #01, $12,933.50; State of Washington, $20,281.74; and Rochester School District, $30,069.08. *Id*.

In 2008 and 2009, the Assessor assessed and levied taxes on the improvements at their full completion value. The Assessor did not split the assessed value according to CTGW's proportionate ownership. The tax for each of these years was in excess of $800,000. Galanda Decl., Exhs. P and P(2).

1    Defendants claim that the property tax supports various services that directly
2  benefit the Lodge, the most important of which are emergency medical services, law
3  enforcement, court forum for litigation, and road maintenance services. Dkt. 100 at 17-
4  22. Plaintiffs claim that the "sum total of demonstrable impact caused by the Lodge to
5  local government" is as follows:

- Eleven Medic One calls, some of which were downgraded to [basic life support];
- [Thurston County's 911 emergency call center's] mere referral of emergency calls to the Tribal Police or Fire District # 1, which the Tribe in turn either handles or pays the District to handle;
- One food-borne illness complaint that was referred to the United States;
- A recorded deed of trust filed by the [CTGW's] financiers;
- Four garnishment actions in which CTGW was a passive third party;
- The prosecution of a single incident of theft at the Lodge;
- The Lodge's one-time use of a School District lot for overflow parking; and
- Road plowing, beyond the Trust Property, during one snow event.

Dkt. 113-2 at 28–29.

   The Tribe pays the county $50,000 per year for law enforcement and $160,000 per year to the Fire District. *Id*. at 26–27. Defendants argue that these fees are "unrelated to the [Lodge] and irrelevant to the consideration of the facts of this case" because the fees are required to offset the impact of the Tribe's class III gaming casino that also operates on the Tribe's reservation. Dkt. 129 at 33-34.

   Plaintiffs claim that Thurston County Sheriff Daniel D. Kimball stated that the Lodge has caused no impact on the Sheriff's ability to provide law enforcement within surrounding Grand Mound or South Thurston County. Galanda Decl., Ex. J at 18:17-20:6. Defendants counter that Plaintiffs have taken Sheriff's Kimball's statement out of context and that "the Sheriff has responded to approximately 30 times [sic] each year to the Great Wolf Lodge for calls other than traffic stops and DUIs." Dkt. 100 at 18 (citing Dkt. 101, Declaration of Scott Cushing, Exh. 17 at 13:10-14:5).

   With regard to road maintenance services, Defendants claim that the "Thurston County Roads Department provides road maintenance on all county roads, and in

ORDER - 6

particular, maintains Old Highway 99, the roadway from which the [Lodge] is accessed." Dkt. 100 at 17. Plaintiffs counter that anyone is free to use Old Highway 99 and therefore that maintenance service is not provided to the Lodge. Dkt. 125 at 15.

With regard to the Rochester School District, Defendants claim that approximately 115 students in the district are members of Tribe. Dkt. 100 at 20. Plaintiffs counter that schools provide "services to children and their families" and do not provide services to either CTGW or the Lodge. Dkt. 125 at 19.

Finally, the record, although voluminous, is relatively silent as to other services provided either to the Tribe or CTGW. For example, Defendants concede that the "Port of Olympia is not known to provide direct services to CTGW . . . ." Dkt. 100 at 21. There is also an absence of evidence regarding whether either the Tribe or CTGW use the cemetery and/or the Timberland Library.

### III. DISCUSSION

**A.   Preliminary Matters**

Plaintiffs' first claim for relief is that Defendants' attempt to levy and collect taxes is "*per se* invalid as a matter of federal law." Amended Complaint, ¶ 44. The Supreme Court has stated that in "the special area of state taxation of Indian tribes and tribal members, we have adopted a per se rule." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 n. 17 (1987). The tax, however, is levied against CTGW, a Delaware corporation, which is neither an Indian Tribe nor a tribal member. In Plaintiffs' response to Defendants' motion, they state that they "hereby withdraw their tribal entity *per se* claim." Dkt. 125 at 2. Therefore, the Court grants Defendants' summary judgment on Plaintiffs' first cause of action.

Second, Defendants move to strike an extraordinary amount of Plaintiffs' proposed "undisputed facts." Dkt. 129 at 3-13. The majority of Plaintiffs' "undisputed facts" are simply legal arguments and, even if the objected-to *facts* were established as true, they would not establish a material question of fact. Therefore, instead of addressing each one

1  of Defendants' evidentiary objections, the Court will set forth the facts upon which this
2  decision is based.

3  The Court now turns to the parties' cross motions for summary judgment.

**B.     Summary Judgment**

Defendants move for summary judgment on Plaintiffs' two remaining causes of action, *Bracker* preemption and *ultra vires* action. Dkt. 100 at 6-25. Plaintiffs move for summary judgment on *Bracker* preemption. Dkt. 113-2 at 1.

**1.     Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

When "the parties file cross motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties . . . ." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). In this case, the parties have filed cross-motions for summary judgment and the Court finds that the record is sufficient to "show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). In fact, the parties agreed at oral argument that there are no questions of material fact and that a trial is unnecessary. Therefore, the Court will enter judgment as a matter of law based on the current record.

### 2. *Bracker*

When a "State asserts authority over the conduct of non-Indians engaging in activity on the reservation," the court must engage in "a particularized inquiry into the nature of the state, federal, and tribal interests at stake . . . to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145–46.

> The Supreme Court has identified a number of factors to be considered when determining whether a state tax borne by non-Indians is preempted, including: "the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax."

*Salt River Pima-Maricopa Indian Cmty. v. State of Ariz.*, 50 F.3d 734, 736 (9th Cir. 1995) (citation omitted). The district court should weigh these interests as follows:

ORDER - 9

> the balancing required of a court determining whether taxation by the State is preempted has the ad hoc and particular character of a common law case developing common law based on the facts and like a common law decision must not do violence to precedent and must indeed fit within the frame established by precedent.

*Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1109 (9th Cir. 1997), *cert. denied*, 522 U.S. 1076 (1998). The burden of proof is on the party seeking preemption. *Id*.

Plaintiffs argue that the Court should focus on the property in question because the taxes are property taxes. *See, e.g.*, Dkt. 125 at 4. During oral argument, Plaintiffs' counsel stated that in a non-sales tax or property tax case, the balance of interests should tip in favor of preemption. There is no precedent for this proposition. Moreover, the established precedent instructs that the Court should balance the federal, tribal, and state interests. Therefore, the Court declines Plaintiffs' invitation to implement a dispositive distinction based on the fact that the state actor assess a personal property tax in contrast to a sales or business tax.

When scheduling oral argument, the Court posed the question to the parties of whether *Yavapi-Prescott* was the frame established by precedent, based on significant factual similarities. Although Plaintiffs tried to distinguish *Yavapi-Prescott* on multiple grounds, it is the most factually similar precedent that frames the analysis of this case. In *Yavapai-Prescott*, the Ninth Circuit addressed the issue of whether the Arizona business transaction privilege tax was preempted under *Bracker*. The plaintiff tribe entered into an agreement with Prescott Convention Center, Inc., an Arizona corporation ("PCC"), to build and lease a 161-room hotel and convention center. 117 F.3d at 1108. The state of Arizona assessed its business transaction tax and the tribe filed a federal action seeking injunctive relief. *Id*. at 1108–09. After reviewing three Ninth Circuit cases where the federal and state interests were balanced, the court categorized the relevant facts into those that favored preemption and those that weighed against preemption. *Id*. at 1111–13.

In this case, the facts before the Court that favor federal preemption are very similar to some of the facts that were before the *Yavapai-Prescott* court. For example, the

Tribe furnished the land for the Lodge, the Tribe has a residual interest in the Lodge, income from the Lodge contributes to the economic well-being and self-sufficiency of the Tribe, and the Secretary of the Interior has approved the Lease.  As in *Yavapai-Prescott*, these facts weigh in favor of preemption.

However, aside from the federal government approving the Lease and a single health inspection performed by the United States Department of Health and Human Services, there is no significant regulatory oversight of the Lodge by the federal government, notwithstanding Plaintiffs' claim that the United States has Pervasive Control Over the [Lodge]" as laid out in paragraphs 96-110 of Plaintiffs' motion for summary judgment (Dkt. 113-2).

In contrast to *Yavapai-Prescott*, the Tribe does not have ownership interest in the Improvements as they are owned by CTGW for the term of the Lease.  Moreover, the Tribe does not operate gaming within the Lodge and the majority of the funding for the Lodge was loaned to CTGW from non-tribal and non-federal sources.  These facts show that the federal and tribal interests in this case are on balance weaker than the federal and tribal interests that were identified in *Yavapai-Prescott*.

Plaintiffs, however, contend that the "Tribe plays an active role in the Property . . ." (Dkt. 125 at 9) and that the "Tribe has a majority interest in and control over the Lodge . . . ." (Dkt. 179, Declaration of Anthony S. Broadman, Exh. A at 1).  The Tribe's only relevant exercise of authority, however, is the authority to approve the annual operating budget for the Lodge, which may not be unreasonably withheld and is subject to binding arbitration.  Even if this were considered a more active role in the operation of the Lodge than was present in the operation of the hotel in *Yavapai-Prescott*, the Tribe is significantly removed from the day-to-day management of the Lodge that is performed by Great Lakes Services, LLC, under the provisions of a contract with CTGW in which the Tribe has an equitable interest and is not a managing member.

Defendants counter that "the Tribe does not exercise a controlling interest in CTGW or the Great Wolf Lodge and that lack of control illustrates the weakness of the Tribe's interests." Dkt. 100 at 14.  The Court agrees with Defendants to the extent that the relevant contracts limit the Tribe's control over the Lodge.  For example, the LLC agreement states that Great Wolf is the Managing Member with "the power and authority to conduct the business and affairs of [CTGW]."  The management agreement states that CTGW "will not interfere or involve itself in any way in the day-to-day operation of the Lodge."  Therefore, even though the Tribe may receive 51% of the net profits of CTGW, the evidence in the record shows that the Tribe lacks control over the Lodge and business decisions regarding the Lodge.

Plaintiffs also argue that the Tribe's paramount interest at stake is its strong interest in economic self-sufficiency and its desire to "steadily decrease its reliance upon federal funding to provide essential Tribal governmental services and programs." Dkt. 113-2 at 22, ¶ 111.  While there is scant evidence that the tax would substantially impair this interest, the court in *Crow Tribe of Indians v. Montana*, 650 F.2d 1104 (9th Cir.1981), said, "It is clear that a state tax is not invalid merely because it erodes a tribe's revenues, even when the tax substantially impairs the tribal government's ability to sustain itself and its programs."  *Id*. at 1116.  Moreover, here, as in *Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232 (9th Cir. 1996), there is "no evidence in the record to indicate that the profits from these facilities are the Tribe's sole source of income." *Id*. at 1238.

With regard to facts that weighed against preemption in *Yavapai-Prescott*, some of those same facts are present in this case.  For example, Great Wolf has employed a relatively small number of tribal members at the Lodge; the bulk of the funding for the Lodge came from non-tribal and non-federal sources; and, although the Tribe is contracted to receive a portion of the net profits, there are currently no profits from the enterprise.

ORDER - 12

Furthermore, the services that Thurston County provides to the Lodge weigh heavily against preemption because there is a close nexus between the local tax and some local governmental services. Law enforcement, emergency fire and medical services, road maintenance, and the county court system are important services that are funded by the challenged property tax. While Plaintiffs concede that they receive some benefits from these local government services (Dkt. 113-2 at 28–29), they argue that "Defendants provide no services, governmental functions, or other significant benefits to CTGW for which the Tribe does not pay or defray through other far more significant financial arrangements." Dkt. 125 at 21. The Ninth Circuit addressed and dismissed a similar argument as follows:

> The Tribe's insistence that there be a direct connection between the state sales tax revenues and the services provided to the Tribe is similarly meritless. As observed in *[Salt River Pima-Maricopa Indian Community v. State of Arizona*, 50 F.3d 734 (9th Cir.), *cert. denied*, 516 U.S. 868 (1995)]*, the Supreme Court has noted that there is no requirement that a tax imposed on non-Indians for reservation activities be proportional to the services provided by the State:
>> Not only would such a proportionality requirement create nightmarish administrative burdens, but it would also be antithetical to the traditional notion that taxation is not premised on a strict quid pro quo relationship between the taxpayer and the tax collector.
>
> 50 F.3d at 737 (*citing* [*Cotton Petroleum v. New Mexico*, 490 U.S. 163, 185 n.15 (1989)]).
>
> The State's interests are sufficient to justify the imposition of its tax on the entertainment events. Even against a "backdrop of Indian sovereignty," the balance of federal, tribal, and state interests present in this matter weighs against preemption of the state tax.

*Gila River*, 91 F.3d at 1239 (9th Cir. 1996).

In conclusion, the Court finds that Plaintiffs have failed to meet their burden in showing that the federal and tribal interests overcome the state interests. The requirement that the state interests be narrowly tailored is "elusive" and "dependant on the strength of the tribal and federal interest found to exist." *Yavapai-Prescott*, 117 F.3d at 1111. While the Tribe has shown a greater involvement in the development of the Lodge than the tribe in *Yavapai-Prescott*, on balance, the federal and tribal interests in this case are even weaker than the minimal federal and tribal interests outlined in *Yavapai-Prescott* and *Gila*

ORDER - 13

*River.* In contrast, the state interests in this case are relatively strong because the Lodge relies upon the local law enforcement, emergency medical and fire services, and road maintenance services. These services are directly correlated to the taxes imposed. Although some services supported by the instant taxes are provided to, but arguably not used by, the Tribe, this fact does not dictate preemption of the taxes because the federal and tribal interests in this case are relatively weak and it would be inappropriate to require such narrow tailoring of the county taxes to the county services. *See Yavapai-Prescott*, 117 F.3d at 1111. Therefore, on the issue of *Bracker* preemption, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion for summary judgment.

**3.**     ***Ultra Vires***

In Plaintiffs' fourth claim for relief, they allege Defendant Thurston County Assessor acted *ultra vires* in assessing the improvements on the property. Specifically, Plaintiffs allege that

> Defendants have acted ultra vires by: (1) disregarding both CTGW as an entity and its undivided fee ownership of the Improvements; (2) apportioning ownership interests between members in contravention of CTGW's governing documents; and (3) assessing a tax based upon an unsupported and baseless percentage of each member's ownership.

Amended Complaint, ¶ 55.

Defendants moved for summary judgment on this claim and argued that the "Assessor's act of assessing CTGW's property was clearly mandated by the Washington statutes and was not *ultra vires*." Dkt. 100 at 24. Plaintiffs countered that "the Assessor, while attempting to tax the property, has: (1) altogether disregarded federal law and (2) vacillated arbitrarily between taxing the property at 49% and 100%." Dkt. 125 at 22. Plaintiffs, however, fail to cite any authority for their arguments.

Under Washington law, the Assessor has a statutory duty to value and assess property. RCW 84.40.030 – .040. "The Legislature has directed that courts and appellate bodies presume the assessor's original determination of value is correct." *Weyerhaeuser*

*Co. v. Easter*, 126 Wn.2d 370, 379 (1995). A taxpayer may overcome this presumption with "clear, cogent and convincing evidence." RCW 84.40.0301.

In this case, Plaintiffs have failed to submit any authority for the proposition that the Assessor acted *ultra vires*. Moreover, Plaintiffs have failed to submit clear, cogent and convincing evidence that the Assessor's valuation is incorrect. Therefore, the Court grants Defendants' motion for summary judgment on this issue and dismisses Plaintiffs' fourth cause of action.

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 100) is **GRANTED** and Plaintiffs' Motion for Summary Judgment Re: *Bracker* Preemption (Dkt. 107) is **DENIED**.

DATED this 2nd day of April, 2010.

BENJAMIN H. SETTLE  
United States District Judge

ORDER - 15